757 A.2d 822 (2000)
334 N.J. Super. 201
FRED McDOWELL, INC., Plaintiff-Respondent,
v.
BOARD OF ADJUSTMENT OF THE TOWNSHIP OF WALL, and the Township of Wall, Defendants/Appellants.
Superior Court of New Jersey, Appellate Division.
Argued March 29, 2000.
Decided August 25, 2000.
*824 Thomas J. Hirsch, Ocean, argued the cause for the appellant Board of Adjustment of the Township of Wall.
Roger Z. McLaughlin, Neptune, argued the cause for appellant Township of Wall (McLaughlin, Bennett, Gelson & Cramer, attorneys; Mr. McLaughlin and Paul N. D'Apolito on the brief).
Paul H. Schneider, Middletown, argued the cause for respondent (Giordano, Halleran & Ciesla, attorneys; Mr. Schneider on the brief).
Before Judges BROCHIN, EICHEN and WECKER.
*823 The opinion of the court was delivered by WECKER, J.A.D.
We have previously recognized a limited exception to the general rule against expansion of a prior nonconforming use, where that use is the mining of a finite resource, also described as a "diminishing asset." See Township of Fairfield v. Likanchuk's, Inc., 274 N.J.Super. 320, 644 A.2d 120 (App.Div.1994), and Moore v. Bridgewater Twp., 69 N.J.Super. 1, 173 A.2d 430 (App.Div.1961). In this opinion, we will address the scope of the diminishing asset exception to the general rule limiting expansion of a prior nonconforming use.
The Wall Township Board of Adjustment rejected plaintiff's application to declare that plaintiff's prior nonconforming use of portions of its 295-acre lot to mine sand and gravel entitled it to extend the mining operation to its contiguous 211-acre lot. On plaintiff's appeal, the Law Division Judge rejected the Board's determination and declared plaintiff's right to mine on both lots as a prior nonconforming use. Defendants now appeal, and we reverse.
As a prerequisite to obtaining a license to mine the second lot, plaintiff, Fred McDowell, Inc. sought a declaration from the Board of Adjustment that mining was permitted as a prior nonconforming use of that lot. The Board denied the requested declaration, finding no prior nonconforming use of the second lot or, in the alternative, finding that plaintiff had abandoned any prior nonconforming use of that lot.
Plaintiff brought an action in lieu of prerogative writs challenging the Board's decision. In a written opinion dated December 21, 1998, the Law Division Judge concluded that the Board "abused its discretion" and therefore was "arbitrary, capricious *825 and unreasonable" when it determined that mining was not a valid "pre-existing, non-conforming right" on the 211-acre lot. Judgment therefore was entered for plaintiff, declaring mining a prior nonconforming use of the 211-acre lot. We disagree with the judge's application of Likanchuk's and Moore to the undisputed facts in the record, which we conclude are sufficient under the law to support the Board's decision. We therefore reverse and reinstate the Board's resolution denying plaintiff's right to mine the 211-acre lot.
McDowell has conducted a mining operation, extracting sand and gravel from its land in Wall Township, since the 1940's. McDowell separately purchased the lots in question, referred to by all parties as Lot 5 (the 295-acre lot) and Lot 7 (the 211-acre lot), in January 1944 and November 1944, respectively. Lot 5 was mined by a prior owner as early as the 1920's.
Wall Township passed its first zoning ordinance in 1955, placing Lots 5 and 7 in a zone in which mining is not permitted. In 1956 the township passed a mining ordinance requiring an annual license to excavate any natural mineral deposit. An ordinance regulating the grading of land and commercial removal of soil was adopted in 1966.[1]
Interstate Highway I-195 was completed in 1976 along the boundary between Lot 5 and Lot 7. Prior to the highway construction, plaintiff maintained a scale, a weigh house and a maintenance building on Lot 7 to serve the mining operation on Lot 5. Plaintiff also used an access road through Lot 7 connecting Lot 5 to Route 34. After construction of I-195, plaintiff discontinued its use of the support facilities on Lot 7, including the access road.
Until the mid-1980's, McDowell repeatedly obtained mining licenses covering both Lots 5 and 7 (as well as several other lots) and actually mined a portion of Lot 5. The ordinance was amended in 1986 to provide for two-year licenses and to require a separate license for each lot.
When McDowell applied in 1988 to renew its mining license for the next two-year term, the Township Committee approved McDowell's request to mine Lot 5, denied McDowell's application for a license for two other lots[2] and for the first time concluded with respect to Lot 7: "[T]he Township Committee finds that with respect to Lot 7 a mining license should not be issued at this time, but that the applicant should be permitted to submit an appropriate application at a later date should it wish to perform mining operations on that Lot." The Committee noted that McDowell had not submitted all of the documents required by township ordinances. In 1991 and 1993, McDowell again applied for a mining license for Lot 7; those applications were similarly rejected for insufficient documentation, while the Township continued to approve licenses for Lot 5. In 1995 plaintiff's application for a license again was granted as to Lot 5 but refused as to Lot 7, "without prejudice." It is the 1995 refusal that ultimately resulted in this appeal.
The licensing authority had sought, among other documentation with respect to Lot 7, a plan certified by the Freehold Soil Conservation District (the District) for soil erosion and sediment control covering the "rehabilitation" of the areas plaintiff *826 intended to mine.[3] In 1995, along with its license application, plaintiff submitted a letter from the District indicating that no soil erosion plan was required because plaintiff proposed no mining on Lot 7 during the next two years. Nevertheless, plaintiff later submitted an approved soil erosion plan to the Board. Thereafter, when plaintiff inquired why it had not received a mining license for Lot 7, the township attorney responded by letter referencing the 1989, 1991 and 1993 resolutions denying a mining license for Lot 7. Eventually the Township Administrator referred McDowell to the zoning board to seek a determination that it had a prior nonconforming right to mine Lot 7.
In its application to the Board, plaintiff did not claim that Lot 7 was actually mined prior to the enactment of the 1955 zoning ordinance. Plaintiff's application relied instead upon two arguments. First, plaintiff argued that Lots 5 and 7 were a single tract, such that the undisputed mining use of Lot 5 prior to enactment of the zoning ordinance established McDowell's right to mine or quarry sand and gravel on the entire tract, that is, throughout Lots 5 and 7. Second, plaintiff relied on its alleged pre-zoning-ordinance use of Lot 7 for certain support operations as an independent ground for declaring prior nonconforming use status to Lot 7 for actual mining.
In determining whether McDowell had established a prior nonconforming use of Lot 7 as of the date the Township passed its zoning ordinance, the primary questions before the Board were (1) whether Lot 7 was part of a single tract including Lot 5, on which extraction of sand and gravel was being carried on before 1955 and as to which plaintiff had objectively manifested its intention to extend its operation to its claimed "reserve," including Lot 7; or (2) whether plaintiff's support activity on Lot 7 by itself established a prior nonconforming use as a sand and gravel mine.
Our task, as was the Law Division Judge's, is to determine whether the Board's negative answer to both those questions was supported by sufficient credible evidence and therefore was neither arbitrary, capricious or unreasonable. We conclude that the record supports the Board's conclusion that McDowell's proofs were insufficient to support either of its arguments. We therefore need not address the Board's alternative finding of abandonment as a ground for denying plaintiff's right to mine Lot 7.
An evidentiary hearing that concluded on March 1, 1998 provided the facts on which the Board relied. McDowell's Vice-President and General Manager for Operations, Frank Fine, testified before the Board regarding the history of McDowell's use of Lots 5 and 7. The only evidence adduced at the hearing was that offered by plaintiff, and the factual testimony and documents offered by plaintiff are not disputed. What is disputed is the interpretation of Likanchuk's and Moore and the application of those decisions to these facts.
These are the additional relevant facts appearing in the record. Mining began on a small portion of Lot 5 in the 1920's. After plaintiff purchased Lot 5 in 1944, it continued to mine "high quality sand" and gravel on a small portion of Lot 5. There was little demand for those materials in the 1940's and therefore only a small volume of material was mined. Demand increased in the 1980's, such that "maybe thirty or forty acres" were mined in that decade, and "in `96, in `95, [plaintiff] mined a lot more than ... in `97." As to the rate at which Lot 5 had been mined, Fine "would guess in the last couple of years, we've mined about twenty acres...." He *827 testified that approximately one hundred to one hundred fifty acres of Lot 5 had been mined as of January 1998.
At an unspecified date, a scale and scale house and a maintenance shop and storage area for the mining equipment were constructed on Lot 7. However, after I-195 was finished in 1976, it became impractical to access Lot 5 from Lot 7, and plaintiff abandoned those uses, as well as the access road through Lot 7 to Route 34.
Lot 7 is now bounded on the north by I-195, by the Garden State Parkway on the east, Allaire State Park on the west, residential housing on the southwest, and a recently approved residential sub-division on the south. Plaintiff originally owned other contiguous property, which was earlier separated from Lot 5 and Lot 7 by the Garden State Parkway. At least one of plaintiff's lots east of the Parkway was sold for residential development.
The only evidence of actual mining on Lot 7 is Fine's testimony that two mine faces remained on Lot 7 and a municipal engineer's report that as of 1987, one acre of Lot 7 appeared to have been mined to a depth of four to six feet. According to Fine, the last time Lot 7 was mined was "[p]robably [the] early seventies." McDowell did not offer evidence of the date when this minimal mining began on Lot 7, or for how long any such activity had taken place. Fine testified that except for a small amount of sand removed each year for plaintiff's own use to deal with icing conditions on the property, "We've ever hardly really ever mined that property. It's always been the reserve...." Plaintiff offered no credible evidence that Lot 7 was actually mined before 1955.
Fine testified that before 1995 McDowell did not submit additional documentation to support its license application for Lot 7 because it had no immediate plans to mine Lot 7, and the process of obtaining all of the necessary documentation was "a rather expensive undertaking to do when you're not intending to mine it." However, as evidence of the intention to maintain Lot 7 as a "reserve" to be mined for sand and gravel after exhaustion of Lot 5, Fine cited test borings McDowell undertook in the 1980's. In answer to the question whether any test borings had been done at an earlier date, Fine answered "No. Just Mr. McDowell when he bought it, he didhe knew what he was buying. He did some testing there and he knew what he was getting into."
Fine also testified that in recent years, a contract farmer continuously cultivated 20 acres of Lot 7, and another 190 acres of Lot 7 were forested to produce firewood. Lot 7 qualified for farmland assessment, and plaintiff paid $817 per year in property taxes on Lot 7. The property tax on Lot 5, assessed as a commercial mine, was more than $92,000 per year.
After the hearing, the Board enacted a resolution detailing its findings of fact and conclusions of law and declaring that mining was not a prior nonconforming use of Lot 7. The Board found that after the construction of I-195:
[A]pplicant removed the scale and abandoned the weigh house and the use of the maintenance buildings in conjunction with the mining operation. There was no longer direct access between Lots 5 and 7 and it was no longer practical or feasible to use the two lots as they had been used prior to the construction of I-195.
Among its findings, the Board specified that McDowell had not mined Lot 7 in any significant fashion since acquiring the property in the 1940's, that the sand on Lot 5 was "not close to becoming exhausted," and that "[s]ince the mining operation commenced in the 1920's and by McDowell in the 1940's, there has been [sic] substantial changes in the development of Wall Township." The Board considered our opinions in Likanchuk's, 274 N.J.Super. 320, 644 A.2d 120 and Moore, 69 N.J.Super. 1, 173 A.2d 430, and expressly relied upon Likanchuk's for its decision. The Board found that *828 there has been residential development which is incompatible with the mining use in reliance on a perceived dormancy or limitation of the excavation activity, at the very least, for the last 25 years [and] [d]ormancy of the mining activity could continue for another 25 years or more on this property....
The Board concluded that
the submission of an incomplete application [for a mining license] does not establish a prior nonconforming right, nor does it establish an intent to continue to use the property as a mining operation to defeat the concept of abandonment [and] at some point, in order to protect a pre-existing non-conforming right, there must be more of a manifest intent than has been established in this case to justify the pre-existing non-conforming status.
The Law Division Judge expressly adopted the Board's factual findings, consistent with the general rule that "[t]he trial court should accept the factual determinations of the agency and lay them against the legal issues to be resolved...." Matter of Valley Road Sewerage Co., 295 N.J.Super. 278, 291, 685 A.2d 11 (App.Div.1996), aff'd, 154 N.J. 224, 712 A.2d 653 (1998) (quoting Boss v. Rockland Elec. Co., 95 N.J. 33, 42, 468 A.2d 1055 (1983)).
The judge distinguished this plaintiff from the property owner in Likanchuk's on legally insufficient grounds, including:
consistent applications by Plaintiff to mine Lot 7, which put the township and the community on notice of Plaintiff's intent; continued recognition through public filings by Wall Township that Lots 5 and 7 are a single mining operation, and a former Township ordinance which recognized that a tract divided by a highway remains contiguous.
Whereas the judge concluded that McDowell's "intent to mine has been objectively manifested from the time the use became nonconforming ... [and] this intent has been made very clear ...," the record plainly shows that the conduct the judge cited post-dated the 1955 zoning ordinance and logically cannot evidence the owner's manifest intent before 1955 to expand the nonconforming use.
The judge distinguished Likanchuk's on the ground that "the property owner had never conducted a full-scale mining operation on any of its parcels ... [whereas McDowell] has an undisputed right to mine Lot 5 and to do so on a full-scale basis." But McDowell's mining on Lot 5 prior to 1955 involved a relatively small portion of that lot. Finally, while the judge noted that "many of the unique facts which led to the decision in Moore... are not present in the instant matter," he nevertheless concluded that mining any portion of the "tract" created the broad prior nonconforming use to mine the entire "tract," ignoring the separate lots. We conclude that in so holding, the trial judge misinterpreted Moore and Likanchuk's and did not give sufficient deference to the Board's decision.
The scope of review applicable to a decision of a municipal zoning board is narrow. The board's decision is not to be set aside unless it is arbitrary, capricious or unreasonable. E.g., Burbridge v. Governing Body of Mine Hill Twp., 117 N.J. 376, 385, 568 A.2d 527 (1990); Kramer v. Board of Adjustment, Sea Girt, 45 N.J. 268, 296-97, 212 A.2d 153 (1965). "Bound by the same scope of review as the Law Division, our role is to defer to the local land-use agency's broad discretion and to reverse only if we find its decision to be arbitrary, capricious, or unreasonable." Bressman v. Gash, 131 N.J. 517, 529, 621 A.2d 476 (1993). It is presumed that the board has acted fairly, see Charlie Brown of Chatham, Inc. v. Board of Adjustment, 202 N.J.Super. 312, 321, 495 A.2d 119 (App.Div.1985), and a reviewing court may not substitute its judgment for that of the board. Kaufmann v. Planning Bd. for Warren Twp., 110 N.J. 551, 558, 542 A.2d 457 (1988).
*829 We first consider the general principles underlying the statutory protection afforded to a prior nonconforming use[4] in New Jersey. With the enactment of the Municipal Land Use Law, N.J.S.A. 40:55D-1 to -129 (the MLUL), the Legislature permitted every municipality to enact a master plan and a zoning ordinance as the land use element of that plan. N.J.S.A. 40:55D-28. Recognizing and encouraging rational zoning in the interest of the public health and welfare, the MLUL balances the municipality's interest in enacting and uniformly applying its zoning ordinance with the rights of property owners who may be affected by a new zoning ordinance.[5] The expression of that balance appears in N.J.S.A. 40:55D-68, which provides in pertinent part:
Any nonconforming use or structure existing at the time of the passage of an ordinance may be continued upon the lot or in the structure so occupied and any such structure may be restored or repaired in the event of partial destruction thereof.[[6]]

[Emphasis added.]
In Shire Inn, Inc. v. Borough of Avon-by-the-Sea, 321 N.J.Super. 462, 729 A.2d 473 (App.Div.), certif. denied, 162 N.J. 132, 741 A.2d 99 (1999), we said:
The pre-existing, non-conforming use concept was developed as an appropriate device for balancing the public interest in sound land use planning and control with the private right to maintain a previously permitted use which, by the passage of time and changing land use patterns, has come to be undesirable in the zone in which it is located.
[Id. at 468, 729 A.2d 473 (citing Town of Belleville v. Parrillo's, Inc., 83 N.J. 309, 315, 416 A.2d 388 (1980)).]
Consistent with the balancing of interests represented by section 68 of the MLUL, a prior nonconforming use is ordinarily restricted to its character and scope at the time the ordinance making it a nonconforming use was enacted; the use is not to be expanded. See, e.g., Palatine I v. Planning Board of Twp. of Montville, 133 N.J. 546, 565, 628 A.2d 321 (1993); Avalon Home & Land Owners Ass'n v. Borough of Avalon, 111 N.J. 205, 210, 543 A. 2d 950 (1988); Hay v. Board of Adj. of Borough of Fort Lee, 37 N.J.Super. 461, 464, 117 A.2d 650 (App.Div.1955). "Because nonconforming uses are inconsistent with the objectives of uniform zoning, the courts have required that consistent with the property rights of those affected and with substantial justice, they should be reduced to conformity as quickly as possible." Town of Belleville v. Parrillo's, Inc., 83 N.J. 309, 315, 416 A.2d 388 (1980); Shire Inn, 321 N.J.Super. at 466, 729 A.2d 473. Nonetheless, a municipality may not take active steps to extinguish nonconforming uses, see Nickels v. City of Wildwood, 140 N.J. 261, 266, 658 A.2d 291 (1995), but instead must wait with "fervent hope that they would in time wither and die and be replaced by conforming uses." Grundlehner v. Dangler, 29 N.J. 256, 263, 148 A.2d 806 (1959).
Expansion of a prior nonconforming use to a larger area of the lot ordinarily is not permitted without satisfying the positive and negative criteria for a "d" variance. N.J.S.A. 40:55D-70(d)(2). Kohl v. Mayor and Council of the Borough *830 of Fair Lawn, 50 N.J. 268, 234 A.2d 385 (1967). Expansion of such a use is not favored, Urban v. Planning Bd., 124 N.J. 651, 656, 592 A.2d 240 (1991), and "[e]xcept in the case of the extractive industries" such as quarrying or soil removal, our courts have rejected attempts to expand prior nonconforming uses "to the boundaries of the property." William M. Cox, New Jersey Zoning and Land Use Administration Ch. 11-6.1 at 254-55 (2000).
Diminishing assets that are extracted from the land involve special circumstances because the nature of the nonconforming use "requires continual expansion over an area," and therefore warrants some exception to the usual rule limiting expansion of a prior nonconforming use. See Likanchuk's, 274 N.J.Super. at 328-29, 644 A.2d 120; Mt. Bethel Humus Co., Inc. v. State, Dep't of Env. Protection and Energy, 273 N.J.Super. 421, 427-28, 642 A.2d 415 (App.Div.1994); Moore, 69 N.J.Super. at 15, 173 A.2d 430; see also Lamb v. A.D. McKee, Inc., 10 N.J. Misc. 649, 160 A. 563 (Sup.Ct.1932); Cox, Zoning and Land Use Administration, Ch. 11-6.2. The question before us, not resolved by Likanchuk's or Moore alone, is the breadth of the diminishing asset exception to the rule against expansion.
In Moore, after restating the basic premise that "while nonconforming uses may be continued as of right they are to be restricted, and may not be enlarged as of right, except where the enlargement is insubstantial or where a variance therefore has been granted," 69 N.J.Super. at 10-11, 173 A.2d 430, we distinguished the extraction of a diminishing asset from other uses of land:
We must not lose sight of the fact that the instant case deals with the removal from land of a natural resource or a diminishing asset, as distinguished from a structure placed upon land or some use made by the owner upon his land. This opinion, of necessity, must be concerned and limited only to its own facts dealing with a diminishing asset.

[Id. at 11, 173 A.2d 430. (Emphasis added).]

....
It is quite obvious that an owner intending to carry on a quarrying operation acquires more land than he thinks he will need so that he will not be a source of nuisance to his neighbors. For practical and economical reasons he must begin operations at one given point and continue from there to a point on his lands where his natural resource ends or at his boundary line. For the same reasons, it is not feasible for him to quarry at different locations at the same time.

[69 N.J.Super. at 15, 173 A.2d 430.]
Nevertheless, we recognized there must be some "outward manifestation of ... intent" and not merely an "unexpressed intention or hope" on the part of the landowner that he intends to utilize an entire parcel for what has become a nonconforming use. Moore, 69 N.J.Super. at 16, 173 A.2d 430; accord Likanchuk's, 274 N.J.Super. at 329, 644 A.2d 120. The nature and extent of the required "outward manifestation" of the intent to expand is a significant factor in our resolution of this case.
Because these diminishing asset cases are fact sensitive, we consider in some detail the facts of each. In Moore, the quarry owner had taken title to a single tract of twenty acres of mountain land, six acres of which were located in Warren and fourteen acres in Bridgewater. He began to quarry stone from the Warren portion in 1931, after a geological survey revealed the value of the rock deposits. He fenced around the entire property, except where a stream created a natural boundary. The owner also contracted to allow a third party the right to remove dirt from any portion of the property. Thereafter, both Bridgewater and Warren adopted land use ordinances in 1950 and 1952 respectively, and quarrying was not permitted in the zones where Moore's land was located.
*831 The quarry had "slowly, but steadily, increased" through the 1950's,[7] and in 1958 Bridgewater found that the quarry had extended 150 feet inside its boundary line.
A group of residents of Warren and Bridgewater brought an action in lieu of prerogative writs, seeking to restrain the entire operation. We found that the landowner had manifested an intent to quarry throughout his parcel, reasoning that "it is difficult to comprehend how a quarry operator would evidence such intent other than by continuing to quarry," id. at 15, 173 A. 2d 430, and Bridgewater's attempt to limit the owner to mining only the six acres in Warren was rejected. We affirmed the trial court's holding that the quarry could continue as a prior nonconforming use on the entire twenty acres in both municipalities.
Significantly, in Moore, the owner had taken title to the entire 20 acres as one piece of property, even though it straddled the boundary line between two municipalities. In this case, defendants have never challenged plaintiff's right to mine all of Lot 5, subject only to certain set-back and buffer restrictions in the licensing ordinance. The Board rejected only the expansion to Lot 7. Moore is consistent with a line of cases in other jurisdictions that recognize "that quarrying as a nonconforming use cannot be limited to the land actually excavated at the time of the enactment of the restrictive ordinance because to do so would, in effect, deprive the landowner of his use of the property as a quarry." Syracuse Aggregate Corp. v. Weise, 51 N.Y.2d 278, 434 N.Y.S.2d 150, 154, 414 N.E.2d 651 (1980). See 4 Zeigler, Rathkopf's The Law of Zoning and Planning, § 51A.04[5][b] (4th ed.); but see, Billerica v. Quinn, 320 Mass. 687, 71 N.E.2d 235 (1947)(prior nonconforming use limited to area actually mined). The New York Court of Appeals in Syracuse Aggregate nevertheless declined to extend its theory to an adjoining but separate parcel. 434 N.Y.S.2d at 154, 414 N.E.2d 651. Contra, Bainter v. Village of Algonquin, 285 Ill. App.3d 745, 221 Ill.Dec. 213, 675 N.E.2d 120, appeal denied, 173 Ill.2d 522, 226 Ill.Dec. 131, 684 N.E.2d 1334 (1997); Smart v. Dane County Bd. of Adjust., 177 Wis.2d 445, 501 N.W.2d 782 (1993).
On very different facts in Likanchuk's, we again addressed a claimed prior nonconforming use involving a diminishing asset. There the defendant operated an automobile salvage business on one of four contiguous lots it owned in Fairfield. On the same lot, defendant also had removed a small amount of earth and gravelless than 500 cubic yards per yearprior to 1969 when Fairfield adopted of an ordinance rendering both mining and the auto salvage lot nonconforming uses. In the 1970's, a large housing development was built alongside the defendant's property. In 1987 the defendant received a municipal license to accept fill and demolition materials on all four lots. By 1988, neighbors were complaining about the volume of the operation, which had reached a level of 100 truckloads of gravel on some days.
When the municipality brought suit to restrain Likanchuk's mining operations, the Chancery Division required it to apply to the zoning board for a determination regarding the extent of the prior nonconforming use. The Board determined that Likanchuk's had a prior nonconforming right to remove sand and gravel only at the prior rate and on the single lot, that is, at the same intensity as when the zoning ordinance was passed. The Chancery Division reversed, finding that "mining was permitted on the entire property as a prior nonconforming use, because the activity involved a `diminishing asset.' " Id. at 327, 644 A.2d 120.[8]
*832 Reversing the trial court and reinstating the Board's decision, Judge Havey wrote for this court:
[S]imply because the nature of the use involves a diminishing asset does not necessarily justify its expansion. Because of the expressed aversion toward expansion of nonconforming uses, the "diminishing asset" theory must be applied with caution. Public concern toward wholesale excavation and its attendant dangers are well founded. See Bernardsville Quarry, Inc. v. Borough of Bernardsville, 129 N.J. 221, 236-38, 608 A.2d 1377 (1992); Dock Watch Hollow Quarry Pit, Inc. v. Township of Warren, 142 N.J.Super. 103, 125, 361 A.2d 12 (App.Div.1976), aff'd o.b., 74 N.J. 312, 377 A.2d 1201 (1977). Also, neighboring property may be developed for residential or other uses which are incompatible with the mining use in reliance on the perceived dormancy or limitation of the excavation activity at the time it became a nonconforming use.
Therefore, in such cases the owner must show that the entire tract was "dedicated" to the mining activity despite the fact that the activity was limited when it was rendered a nonconforming use. Moore, 69 N.J.Super. at 15-16, 173 A.2d 430. The mere unexpressed intention or hope of the owner to use the entire tract at the time the restrictive zoning ordinance is adopted, is not enough. Intent must be objectively manifested by the initial and ongoing operation of the owner before the activity was rendered nonconforming by the newly adopted regulation. See id. at 16, 173 A.2d 430.
[Id. at 329, 644 A.2d 120. (Emphasis added).]
The critical facts in Likanchuck's were that prior to the adoption of the ordinance, the landowner's activity had been confined to one of the four lots; the defendant did not systematically expand its prior nonconforming use over the years; the primary use of the disputed lot was as an auto salvage yard; and the mining use had been incidental. Id. We therefore found that the owner did not establish an "objectively manifested" intention to expand the mining operation to the entire tract, id. at 330, 644 A.2d 120. We also found it "significant" that after 1969, "a substantial residential development was constructed contiguous to the property. The developer and subsequent buyers no doubt relied on the perceived limitation of the mining activity." Id. We therefore limited the mining operation to its original lot and its previous scale.
Defendants argue before us that Likanchuk's controls and supports the denial of prior nonconforming use protection for Lot 7, whereas McDowell contends that future mining on Lot 7 is permitted by Moore. The facts before us do not closely parallel either case. While all applications for protected status as a prior nonconforming use are fact sensitive, the relatively rare cases involving a diminishing asset are especially so.
We do not view Moore and Likanchuk's as inconsistent. Rather we draw the conclusion from both cases that the "diminishing asset" exception, which widens the otherwise narrow protection afforded a prior nonconforming use, must be applied with caution, see Likanchuk's, 274 N.J.Super. at 329, 644 A.2d 120, and with due regard to the specific facts on a case-by-case basis. See Moore, 69 N.J.Super. at 11, 15, 173 A.2d 430. In Moore, we allowed the rock quarrying operation that pre-dated the zoning ordinance to continue to the boundaries of a twenty-acre tract under the following circumstances: quarrying had gradually expanded from the
original site on the tract since before the enactment of the zoning ordinance; the owner had fenced virtually the entire tract; the topography made other uses of the *833 land impractical; and the immediately surrounding area was not residentially developed. By contrast, prior to the zoning ordinance in Likanchuk's, the extraction operation was always secondary to the auto salvage business; its volume was limited; it was conducted on only one of four lots comprising the tract for which the owner sought protection;[9] residential development had taken place on neighboring property since the zoning changes; and there was no evidence that other uses of the lots were impractical. Thus in Moore there was sufficient objective, manifest intention on the part of the owner to expand to the boundaries of the tract, evidence that was lacking in Likanchuk's and is lacking here.
On the one hand, we have recognized and continue to recognize that extraction of a diminishing asset, such as the sand and gravel mining conducted by the property owner in this case, is a distinct category of prior nonconforming use that warrants some exception to the rule against expansion of a prior nonconforming use. On the other hand, the municipality's recognized right to limit prior nonconforming uses and to bring such uses into conformity with subsequently enacted zoning ordinances remains the rule and cannot be swallowed by the diminishing asset exception. We are satisfied that the diminishing asset exception has reasonable limits and does not stand for the proposition that unlimited expansion of a mining site is permissible, irrespective of other potentially relevant factors.
In setting limits to the expansion of a prior nonconforming use to extract a diminishing asset, thereby balancing the inherent tension between the rule and the exception and between the legitimate interests of the municipality and those of the property owner (and in the absence of legislation more specific than § 68 of the MLUL), we deem it reasonable for a zoning board to consider, without limitation, such factors as the size of the lot or tract for which the prior nonconforming use is claimed; the rate of extraction as well as the rate of expansion as of the date the ordinance was enacted; the projected exhaustion of the asset at the present rate of extraction; evidence that the owner manifested its intention to expand before the zoning change; and the nature of development of surrounding properties and the community since the enactment of the zoning ordinance that rendered the prior use nonconforming.[10]
*834 In support of its claimed prior nonconforming use, including its objectively manifested intention (before 1955) to expand into Lot 7, plaintiff offered the Board only vague references to the historical rate of expansion of plaintiff's mining operation. In the hearing before the Board, plaintiff proceeded not on the basis of any claimed pre-ordinance mining on Lot 7,[11] but rather on the theory that Lots 5 and 7 (along with two other lots no longer in issue) constituted a single tract and that plaintiff objectively manifested its intention before 1955 eventually to expand its extraction of sand and/or gravel to Lot 7, keeping the unmined portions of Lot 5 and 7 in reserve. However, plaintiff's proofs before the Board failed to establish any such objective manifestation of intent. Plaintiff's proofs in that regard consisted only of its repeated applications for mining licenses, all of which obviously post-dated the 1956 licensing ordinance and thus the 1955 zoning ordinance.
Even if viewed as a single tract, plaintiff cannot establish that its intention to expand its sand and gravel extraction to Lot 7 was objectively manifested before 1955 or that extending its mining operation from Lot 5 into Lot 7 is an insubstantial expansion of its prior nonconforming use. Any doubt as to whether an expanded use is substantial must be resolved against expansion. Belleville v. Parrillo's, Inc., 83 N.J. at 316, 416 A.2d 388. Plaintiff does not dispute defendants' contentions that it will be "years" before the resources of Lot 5 will have been fully depleted. Fine's testimony that McDowell "knew what he was buying" does not evidence a manifest intention to expand to Lot 7. Moreover, the farmland assessment that has sheltered plaintiff from any significant property tax on Lot 7, and the forestry maintained on the property, while not dispositive of a prior nonconforming use, evidence the practicality of other uses for the property.
We deem it appropriate for the Board to have considered the nature of development in the surrounding area since the zoning ordinance, as well as the opportunity of neighboring property owners to assess the apparent use of the subject property. The Board found that "in fact, there has been residential development which is incompatible with the mining use in reliance on a perceived dormancy or limitation of the excavation activity, at the very least, for the last 25 years." It had been 40 years since Wall Township passed the zoning ordinance that made mining a nonconforming use. The Board was entitled to consider the substantial changes and development in the township as it addressed the scope of plaintiff's right to extend the prior nonconforming use on Lot 5. Residential development in close proximity to Lot 7, undertaken in the absence of demonstrated evidence that Lot 7 would be changed into a mining or quarrying site, is entitled to some protection.
Other jurisdictions that have recognized the diminishing asset doctrine as an exception to the rule against expansion of a prior nonconforming use have generally required some demonstrated intent to extend the extraction operation into the areas later claimed to be protected for such use. E.g., Hansen Bros. Enters., Inc. v. Board of Supervisors of Nevada Co., 12 Cal.4th 533, 48 Cal.Rptr.2d 778, 792, 907 P.2d 1324 (1996); Stephan and Sons, Inc. v. Municipality of Anchorage Zoning Bd., 685 P.2d 98, 102 (Alaska 1984); Syracuse Aggregate Corp. v. Weise, 51 N.Y. 2d 278, 434 N.Y.S.2d 150, 155, 414 N.E.2d 651 (1980); Town of Wolfeboro v. Smith, 131 N.H. 449, 556 A.2d 755, 757 (1989).
*835 In support of its argument that Lots 5 and 7 should be treated as one, McDowell cites a 1978 Wall Township mining ordinance, later repealed, which the Law Division Judge also relied upon. The 1978 ordinance provided in part that "division of a tract by a road ... shall not ... render the portions thereof non-contiguous." In support of his ruling, the judge also relied upon a 1981 municipal document listing mines in the town, which included Lots 5 and 7 as a "single mine." Neither the ordinance nor the list, each created long after the zoning ordinance was enacted, evidences a nonconforming use of Lot 7 before 1955. Nor is it up to the municipal governing body to determine whether a prior nonconforming use exists. See Cronin v. Township Comm. of Chesterfield, 239 N.J.Super. 611, 618-20, 571 A.2d 1354 (App.Div.1990).
Moreover, section 68 of the MLUL explicitly refers to the owner's right to continue "a nonconforming use ... existing... upon the lot ...." N.J.S.A. 40:55D-68. McDowell implicitly seeks to apply the Loechner doctrine, holding that contiguous nonconforming lots assembled under one owner become one parcel and therefore require planning board approval for subdivision. Loechner v. Campoli, 49 N.J. 504, 511-12, 231 A.2d 553 (1967). See generally, Cox, Zoning and Land Use Administration, Ch. 12-2. In the Loechner situation, merger is employed to further the goal of bringing (or keeping) nonconforming lots into conformity with the zoning ordinance and thereby serving the overall goals of the master plan. By contrast, if we were to adopt such a merger theory to render the once "contiguous" Lots 5 and 7 as one "lot" and to apply the protection of § 68 to Lot 7 as well as to Lot 5, the result would be to expand the nonconforming use, contrary to the purposes of the local zoning ordinance and the master plan. We therefore reject plaintiff's implicit merger argument.
We hold that contiguity alone does not evidence the intent to expand nor otherwise warrant expansion of a prior nonconforming use on one lot to an adjoining lot under the same ownership. Cf. Struyk v. Samuel Braen's Sons, 17 N.J.Super. 1, 5, 85 A.2d 279 (App.Div.1951), aff'd o.b., 9 N.J. 294, 88 A.2d 201 (1952), where then Judge (later United States Supreme Court Justice) William J. Brennan, Jr., held that a property owner who had operated a quarry on his property before a zoning ordinance placed that property in a residential zone, and who acquired an adjoining property after the zoning ordinance was enacted, did not have the right to extend its quarry onto the later acquired land on a prior nonconforming use theory.
Finally, we analogize to the standard of review applicable to a zoning board decision on a variance application for a nonconforming use. See generally, Medici v. BPR Co., 107 N.J. 1, 526 A.2d 109 (1987). It is a well-settled principle that greater deference is accorded to a resolution denying the variance than to one granting the variance. See, e.g., Cerdel Constr. Co., Inc. v. Township Comm. of East Hanover, 86 N.J. 303, 307, 430 A.2d 925 (1981) (affirming denial); New York SMSA Ltd. Partnership v. Board of Adj. of Bernards, 324 N.J.Super. 149, 164, 734 A.2d 817 (App.Div.), certif. denied, 162 N.J. 488, 744 A.2d 1210 (1999) (affirming denial); Funeral Home Mgmt., Inc. v. Basralian, 319 N.J.Super. 200, 208, 725 A.2d 64 (App.Div.1999)(reversing grant). That principle is based upon the Board's familiarity both with conditions in the municipality and with the land use plan embodied in the zoning ordinance, as well as disfavor for deviations from that plan. For similar reasons to those supporting deference to a board's decision denying a variance for a new nonconforming use, the board's decision denying prior nonconforming use protection or expansion is entitled to greater deference than a decision finding and protecting a prior nonconforming use.
*836 We do not reach the issue of abandonment, the Board's alternate ground for its decision, in light of our conclusion that there was no prior nonconforming use of Lot 7. See Ferraro v. Zoning Bd. of the Bor. of Keansburg, 321 N.J.Super. 288, 291, 728 A.2d 863 (App.Div.1999). We merely note that the right to continue a prior nonconforming use may be lost not only through abandonment (which has been held to involve an intention to abandon the use) but also through cessation of the prior nonconforming use. See Villari v. Zoning Bd. of Adj. of Deptford, 277 N.J.Super. 130, 135, 649 A.2d 98 (App.Div. 1994) (citing Camara v. Board of Adj. of Tp. of Belleville, 239 N.J.Super. 51, 56-57, 570 A.2d 1012 (App.Div.1990)). See generally 12 Powell on Real Property § 79C.06[3][f]; 4 Rathkopf's § 51B.02.
The credible evidence in the record supports the Board's conclusion that the minimal mining support activities that plaintiff conducted on one acre of Lot 7 before I-195 separated it from Lot 5, activities not proven to have occurred before 1955, do not establish a prior nonconforming mining use of Lot 7. The law also supports the Board's determination that Lot 7 is not entitled to the protection afforded by the prior nonconforming use of Lot 5.
We reverse and remand to the Law Division for entry of judgment reinstating the determination of the Wall Township Zoning Board.
NOTES
[1] Municipal regulation of mines or quarries by means of licensing or permit ordinances is a permissible exercise of delegated police power. Bernardsville Quarry, Inc. v. Borough of Bernardsville, 129 N.J. 221, 228-30, 608 A.2d 1377 (1992).
[2] The Commission resolution stated that there was "no evidence that mining was ever conducted in the past on [Lots 1 or 11] ... [and] no nonconforming mining use has been established for those Lots." The validity of a proposed prior nonconforming use must be determined by the Zoning board and not by the municipal governing body, see Cronin v. Township Committee of Chesterfield Twp., 239 N.J.Super. 611, 618-20, 571 A.2d 1354 (App. Div.1990); however, plaintiff has abandoned any intention to mine Lots 1 and 11.
[3] With its 1986 application, plaintiff submitted a letter from the Freehold Soil Conservation District expressing the anticipation that it would certify a "Soil Erosion and Sediment Control" plan for Lot 5 and relating McDowell's own certification that it "proposes no land disturbing activity over 5000 [square] feet for the next two years," and therefore no plan was necessary.
[4] " `Nonconforming use' means a use or activity which was lawful prior to the adoption, revision or amendment of a zoning ordinance, but which fails to conform to the requirements of the zoning district in which it is located by reasons of such adoption, revision or amendment." N.J.S.A. 40:55D-5.
[5] Although plaintiff's complaint included an allegation that the Board's resolution "violates the Constitution of the United States and of the State of New Jersey," plaintiff did not raise a constitutional claim in the Law Division, nor does plaintiff make such a claim on this appeal.
[6] The statute further provides the mechanism for obtaining a certification of prior nonconforming use from the Municipal Zoning Board.
[7] For several years, each municipality apparently disclaimed territorial power over the quarry and therefore abstained from any attempt to enforce its own zoning ordinance.
[8] While the mining issue was being litigated, the owner had also sought and obtained conditional permission from the county and the Department of Environmental Protection to operate a recycling center on the property, subject to local law. Our rejection of the property owner's estoppel argument in Likanchuk's, regarding its recycling operation, is not relevant here.
[9] The reported opinion does not reveal the size of the lots.
[10] Several states have resolved the conflicting interests of the municipality and the property owner by "amortization" of the prior nonconforming use. See generally 12 Powell on Real Property § 79C.06[4][b] (1999); 4 Rathkopf's § 51B.05. Either by statute or case law, those states have permitted municipalities to limit the future life of a prior nonconforming use, so long as the permitted life is rationally related to the property owner's investment expectations. See, e.g., Ouimet v. Frasier, 240 A.D.2d 906, 658 N.Y.S.2d 733 (1997); Hansen Bros. Enterprises, 48 Cal.Rptr.2d at 789-90, 907 P.2d 1324; Lone v. Montgomery County, 85 Md.App. 477, 584 A.2d 142, 153 (Md. 1991)(ten-year amortization period for nonconforming multi-family dwelling was reasonable); Town of Islip v. Caviglia, 73 N.Y.2d 544, 542 N.Y.S.2d 139, 148, 540 N.E.2d 215 (1989)(amortization period must allow recapture of investment); Rives v. City of Clarksville, 618 S.W.2d 502, 509 (Tenn.Ct.App.1981)(amortization does not violate federal or state constitutions). But see Bauer v. Waste Mgmt. of Connecticut, Inc., 234 Conn. 221, 662 A.2d 1179, 1191 (1995)(amortization conflicts with statutory protection for nonconforming use); PA Northwestern Distributors, Inc. v. Zoning Hearing Bd. of Twp. of Moon, 526 Pa. 186, 584 A.2d 1372 (1991)(amortization violates state constitution); State v. Bates, 305 N.W.2d 426 (Iowa 1981)(amortization not specifically authorized by statute or state constitution); Hoffmann v. Kinealy, 389 S.W.2d 745 (Mo.1965) (amortization void on constitutional grounds).

New Jersey has never taken such an approach. See United Advertising Corp. v. Borough of Raritan, 11 N.J. 144, 152, 93 A.2d 362 (1952), (ordinance requiring removal of nonconforming signs was invalid because it conflicted with the predecessor to N.J.S.A. 40:55D-68).
[11] Although the Board's finding that plaintiff never mined Lot 7, combined with the undisputed evidence of two small, "old" mine faces on that lot, permit the inference that at sometime before 1944 minimal mining was conducted on Lot 7, the inference is equally available that the minimal mining took place after 1955. Plaintiff has offered no other proof of mining conducted on Lot 7 before 1955 and has not relied upon the actual conduct of mining operations on Lot 7 to support its claimed prior nonconforming use.