62 A.3d 908

## DANIEL MOTLEY, PLAINTIFF-RESPONDENT, v. BOROUGH OF SEASIDE PARK ZONING BOARD OF ADJUSTMENT, DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 11, 2013—Decided March 4, 2013.

Before Judges SABATINO, FASCIALE and MAVEN.

*Gregory J. Hock* argued the cause for appellant (*D'Arcy, Johnson, Day, P.C.,* attorneys; *Mr. Hock,* of counsel and on the brief).

*E. Allen MacDuffie, Jr.,* argued the cause for respondent (*MacDuffie Law, LLC,* attorneys; *Mr. MacDuffie,* on the brief).

The opinion of the court was delivered by

SABATINO, J.A.D.

Defendant, the Zoning Board of Adjustment ("the Board") of the Borough of Seaside Park ("the Borough"), appeals the trial court's decision in this action in lieu of prerogative writs. The court's decision nullifies a "stop work" order issued by the Borough and authorizes plaintiff Daniel Motley to restore his nonconforming house, which had been torn down to its foundation and footings, back to its prior dimensions.

We reverse the trial court's decision to nullify the stop work order because *N.J.S.A.* 40:55D–68 allows a nonconforming structure to be rebuilt only if it has been "partially" destroyed. We also reverse the decision because the record establishes that plaintiff's dismantling of all of the interior and exterior walls and his attempt to rebuild the house exceeded the scope of the zoning permit that had been issued to him. However, we affirm the trial court's rejection of plaintiff's separate claim that the stop work order should be invalidated by principles of equity.

I.

Plaintiff is the owner of property located on Block 65, Lot 55 in the Borough of Seaside Park, with an address of 213 "O" Street. The property lies within Seaside Park's R–3 zone, which is restricted to single-family uses. The parties agree that the property is a pre-existing nonconforming use, as it contains two structures, the front building ("213A") and the rear building ("213B"), which were erected in or around 1931, long before the zone restrictions were put into effect in 1972. Both buildings are used as single-family dwellings. Plaintiff's brother has occupied the rear build-

ing.[1]  Plaintiff, meanwhile, occupied the front building for a number of years.

When plaintiff bought the property with his brother in 1999, the front building's main floor had two bedrooms, a kitchen, a bathroom, and a living room.  Above the main floor was a loft area, which was used as a "kids' room."  The property does not conform to the zoning ordinance's bulk requirements with respect to its lot width, lot depth, lot area, front yard setback, rear yard setback, side yard setback, and building coverage.

Plaintiff initially decided in 2007 to pursue renovations of the front house after pipes in its hot water system burst in or about 2006 and caused significant water damage.  In addition, he sought to add a complete second story to that building.  To that end, plaintiff filed an application with the Board for a use variance to authorize the second floor addition as an expansion of a nonconforming use.  Plaintiff also sought numerous associated bulk variances.

The Board denied the variance application in February 2008.  In its resolution memorializing that denial, the Board noted, among other things, that the property "contains a pre-existing non-conforming use and expansion of said use would only exacerbate the condition therein."  The Board also determined that the numerous bulk variances that plaintiff requested "would not provide any added benefit and instead [would] cause substantial detriment to the immediate neighborhood."  In addition, the Board found that the proposed project did not "promote the purposes of zoning."

Having failed to obtain variances, plaintiff revised his approach and filed an application for a zoning permit with the Borough in

---

[1] At oral argument on the appeal, we learned from counsel that the rear building was severely damaged by Hurricane Sandy in October 2012.  The parties agree that the damage caused to the property by the hurricane has not mooted this appeal.  We were also advised that reconstruction of the front building has not proceeded during the pendency of the Board's appeal.

August 2009. His permit application sought to allow "repair [and] renovation of [the] existing dwelling" at 213A and to allow for replacement of 213A's airconditioning unit. Plaintiff included the construction plans with the application.

The Borough's new zoning officer, James Mackie, approved the permit application on August 28, 2009. However, Mackie noted on the approval form that there was to be "[n]o expansion of [the structure's] dimensions." Mackie also wrote on the approval form: "[s]iding, shingles, additional [windows] only—no bump-outs." [2] Plaintiff sought and obtained several other permits in relation to his project, which are not germane to the zoning issues before us.

According to his testimony in the record, Ralph Finelli, a licensed architect retained by plaintiff in developing the renovation plan, characterized the project as a "rehab [of] the entire building" and a "total renovation" of the building's interior and exterior. Finelli stated that the plan included in plaintiff's application provided for replacement of the "roof, frame and finish," and a new floor. He also noted that a new staircase was to be installed to replace an existing "ship[ ] ladder" that led into the loft area, and a new upstairs bathroom was to be installed. Finelli further stated that the renovation plan would not change the structure's existing dimensions..

Steven Lisa, plaintiff's construction superintendent for the renovations of 213A, testified that the roof was removed first. According to Lisa, as the work on the house progressed, it became clear that there was more damage to the structure than was initially known. Lisa stated that the structure was in "[m]uch worse" condition than he had anticipated. Among other things, parts of the building had been made from "debris," and there was "no consistency to the dimensioning" of the wall frames. The roof was also leaking, and the hot water system in the loft had leaked and

---

[2] Mackie omitted the word "windows" on the form, but subsequently corrected this error.

caused part of the first-floor ceiling to collapse. Lisa stated that the hope was to keep as much of the existing walls as possible to save costs, but that the condition of the structure did not permit that approach. Many floor beams were rotted, and the "main center beam through the middle of the house" was sagging "six to eight inches."

Eventually, a building inspector [3] of the Borough, Gary Swizczynski, determined that the entire structure needed to be removed. The building was not habitable before construction began, and evidently had not been habitable since 2005 or 2006. Plaintiff proceeded with the demolition, without contacting Mackie, the zoning official.

On February 4, 2010, the Borough's code enforcement officer, Patrick Linkovich, issued a stop work order, after discovering the extent to which plaintiff and his contractors had demolished the front building. According to Mackie, the order was issued because too much of the building had been removed, to an extent that the project had become, in essence, "all new construction." Mackie described the state of the premises at that point as "an existing building that had been stripped of all it[s] siding materials, and roofing materials, and that it was strictly a ... gutted shell[.]"

By the time plaintiff received the stop work order, the floor was still in place but many of the floor beams had been removed, new framing had been installed for all four walls, and the foundation was intact. In addition, a new plate had been installed in the foundation to replace a rotted one.

According to Mackie, plaintiff's actions in tearing down the structure to its foundation and footings went beyond the scope of the zoning permit that had been issued for the project. The extent of the demolition had not been set forth in the plans that plaintiff had submitted when applying for the permit. Mackie

---

[3] Apparently Mackie, the zoning official, was not involved in this determination.

understood the structural facets of the plans to call only for new windows cut into the existing walls, re-siding by way of new shingles, and a new roof. He stated that the terms "reconstruction" or "rebuild" should have been included in the plans if plaintiff had wanted approval for the building to be torn down to its foundation.

Plaintiff contested the issuance of the stop work order and sought to have it vacated by the Board. He contended that the construction plans, which he had shown to Mackie before the zoning permit was issued, sufficiently alerted the Borough to the possibility that the walls might need to be removed. Plaintiff claimed that he had discussed with Mackie replacing the floor joists, insulation, and exterior wall framing, and that he had also discussed installing "composition siding with Tyvek [insulation material]." In the alternative, plaintiff requested that the Board grant him a use variance to allow the construction to continue.[4]

The Board conducted three public hearings on this matter. It heard testimony from plaintiff, his architect Finelli, and his construction superintendent Lisa. It also heard competing testimony from Mackie. In addition, the Board considered comments by several neighbors who were opposed to plaintiff's project, including one neighbor who described the tight fit of the two houses on the lot as the equivalent of "five pound[s] of sausage in a three pound bag."

One of the factors considered by the Board was a provision in the Borough's zoning ordinance, § 25–616(E), stating that a pre-existing nonconforming use may be repaired or maintained, so long as the repair or maintenance does not result in the "total destruction" of the property. That ordinance provision is consistent with *N.J.S.A.* 40:55D–68, which provides in pertinent part:

Any nonconforming use or structure existing at the time of the passage of an ordinance may be continued upon the lot or in the structure so occupied and *any*

---

4 Plaintiff subsequently withdrew this alternative request for a use variance.

*such structure may be restored or repaired in the event of partial destruction thereof.*

[Emphasis added.]

The parties disputed, and continue to dispute, whether or not the demolition of the front building comprised "total destruction" or merely "partial destruction." [5]

Finelli testified for plaintiff that the remaining footings and foundation of the structure represent "conservatively 15 percent of the building and as much as maybe 20 percent of the building." Finelli added that "the footing remain[s] in the ground, the foundation wall remains in the ground, and a new wood frame structure [has been] put on top of the pre-existing, remaining footing and foundation." On this basis, he disputed the Borough's position that there had been "total destruction" of the structure. Mackie, on the other hand, testified that more than ninety-five percent of the structure had been removed. He stated that, given this degree of removal, the decision to issue the stop work order, although not his own, was a "no brainer."

On December 13, 2010, the Board unanimously denied plaintiff's application to lift the stop work order. In its resolution explaining its reasoning, the Board found that Mackie had approved a "repair [and] renovation" of the existing building, with limitations. The Board further determined that, although the plans indicated that a wooden floor and the existing roof frame would be removed and

---

[5] The version of the ordinance that was in effect as of August 28, 2009, when plaintiff's plans were approved, apparently did not define "partial" or "total" destruction, although an even earlier version of the ordinance forbade reconstruction of nonconforming uses which had been more than fifty percent destroyed. As of September 1, 2009, the ordinance was amended to define "total destruction" as no more than fifty percent of the structure or the building's square footage "based on the evaluation by both the Borough's Zoning Officer and the Construction Official using the Borough's Evaluation Checklist." Mackie, however, could not recall consulting such a checklist when the stop work order was issued. For the reasons set forth in Part II(A), *infra*, we need not address whether this definitional provision applies to plaintiff's project, because the Borough's numerical fifty-percent criterion is not dispositive under the statute.

replaced, it did not discern anything in the plans that allowed for the walls to be replaced or removed. The Board thus found that the "demolition and reconstruction effected by the applicant far exceeds the zoning approvals granted," and concluded that the stop work order was properly issued. The Board also determined that plaintiff's installation of stairs, plumbing, and a bathroom in the loft constituted an impermissible expansion of the nonconforming use by creating a second story of living quarters.

Plaintiff then filed an action in lieu of prerogative writs in the Law Division, seeking to overturn the Board's decision. Upon considering the parties' respective positions on de novo review, the trial court issued a written decision on January 24, 2012, reversing the Board's denial of plaintiff's request to lift the stop work order and allowing plaintiff to continue certain development of the property. In particular, the court's decision allowed plaintiff to reconstruct the property's walls and loft, provided that the structure's dimensions not be expanded. The court disallowed, however, the installation of plumbing, a bathroom, and a living area in the building's loft. On February 8, 2012, the trial court issued an order of judgment reflecting these determinations.

In its written statement of reasons, the trial court found that "it was not unreasonable for [plaintiff] to remove and replace the building's walls upon discovery of the unsafe and dilapidated condition of the existing walls." The court perceived that, to encourage property owners' compliance with safety codes, the sounder policy is to allow the "renovation of debilitated nonconforming structures" as long as there is no unlawful expansion of the nonconformity. Because plaintiff's replacement of the walls here did not alter the dimensions of the structure, the court found that such replacement should be allowed without the need for variance relief.

The trial court rejected, however, plaintiff's invocation of the doctrine of equitable estoppel as an independent basis for relief from the stop work order. Moreover, the court found that installation of plumbing, a bathroom, and a sleeping area in the loft

constituted an improper expansion of the nonconforming use, and thus concluded that the Board had not erred in refusing to allow those particular additions without a use variance. In sum, the court determined that plaintiff was "entitled to renovate the front building to its use and within the dimensions that existed prior to the renovations."

The Board now appeals. It argues that the trial court misapplied the governing law in vacating the stop work order and in allowing plaintiff to proceed with the reconstruction of his nonconforming structure.

Plaintiff opposes the Board's contentions, arguing that the trial court had a sound basis to vacate the stop work order.[6] In the alternative, plaintiff argues that, even if *N.J.S.A.* 40:55D–68 is read to not authorize his reconstruction of the premises back to its prior dimensions, he nevertheless should be allowed to finish the reconstruction work based upon equitable principles of estoppel and relative hardship.

## II.

### A.

We begin our analysis with a recognition of the well-settled law of our state that disfavors the continuation of nonconforming uses and structures.

Although land use laws may confer a right to continue a pre-existing nonconforming use, "the policy of the law is to restrict them closely[.]" *Hay v. Bd. of Adjustment,* 37 *N.J.Super.* 461, 464, 117 *A.*2d 650 (1955). This is because their " 'tendency is to subvert rather than support sound planning.' " *Grundlehner v. Dangler,* 29 *N.J.* 256, 274, 148 *A.*2d 806 (1959) (Burling, J., concurring) (quoting *Ranney v. Istituto Pontificio Delle Maestre*

---

[6] Plaintiff has not cross-appealed that portion of the trial court's decision disallowing the construction of a second-story living area.

*Filippini,* 20 *N.J.* 189, 196, 119 *A.*2d 142 (1955)). Accordingly, municipalities "may impose restrictions on nonconforming uses, including prohibiting their expansion." *Conselice v. Borough of Seaside Park,* 358 *N.J.Super.* 327, 333, 817 *A.*2d 988 (App.Div. 2003). Municipalities may not, however, take "active" steps to eliminate nonconforming uses, and must wait with " 'fervent hope that they would in time wither and die and be replaced by conforming uses.' " *Fred McDowell, Inc. v. Bd. of Adjustment,* 334 *N.J.Super.* 201, 214, 757 *A.*2d 822 (App.Div.2000) (quoting *Grundlehner, supra,* 29 *N.J.* at 263, 148 *A.*2d 806), *certif. denied,* 167 *N.J.* 88, 769 *A.*2d 1051 (2001). Moreover, given the statutory objective to eradicate nonconforming uses over time, local governing bodies may not adopt ordinances that authorize the restoration or replacement of all nonconforming structures, even on the condition that the cubic size of the replacement structure does not exceed the size of the existing structure. *Avalon Home & Land Owners Ass'n v. Borough of Avalon,* 111 *N.J.* 205, 543 *A.*2d 950 (1988).

■ As we have noted, the relevant statute, *N.J.S.A.* 40:55D–68, provides that a nonconforming use or structure "may be restored or repaired in the event of *partial destruction* thereof." (Emphasis added). By contrast, total destruction of such a structure, "whether by the owner's design or by accident," terminates a nonconforming use and the owner's right to continue that use likewise ceases. *S & S Auto Sales, Inc. v. Zoning Bd. of Adjustment,* 373 *N.J.Super.* 603, 619–20, 862 *A.*2d 1204 (App.Div.2004).

■ The term "partial destruction" is not defined by *N.J.S.A.* 40:55D–68, nor is the reciprocal concept of "total destruction." Prior cases have construed total destruction to mean "substantially totally destroyed." *Camara v. Bd. of Adjustment,* 239 *N.J.Super.* 51, 56, 570 *A.*2d 1012 (App.Div.1990); *see also Krul v. Bd. of Adjustment,* 122 *N.J.Super.* 18, 298 *A.*2d 308 (Law Div.1972), *aff'd,* 126 *N.J.Super.* 150, 313 *A.*2d 220 (App.Div.1973); *Twp. of Lacey v. Mahr,* 119 *N.J.Super.* 135, 138, 290 *A.*2d 450 (App.Div.1972). In essence, the test of whether a nonconforming use or structure may

be restored or repaired is whether there has been some quantity of destruction that surpasses mere partial destruction.

The scenario in *Lacey, supra,* 119 *N.J.Super.* at 135, 290 *A.*2d 450 aptly illustrates these concepts. In that case, an inn operating as a pre-existing nonconforming use was damaged by a fire. *Id.* at 137, 290 *A.*2d 450. The proprietors attempted to restore portions of the building as living quarters for themselves, but the township brought an action against the proprietor to prevent that restoration. *Ibid.* The township argued that the destruction of the building caused by the fire "was so extensive as to preclude [the proprietors'] right to restore it." *Ibid.* At trial, the township contended that sixty-nine percent of the building was totally destroyed, and that an additional fourteen percent was "badly gutted." *Ibid.* The proprietors conversely asserted that one-third of the structure remained. *Ibid.* The trial judge accepted the township's contention that the inn was "totally destroyed" under *N.J.S.A.* 40:55–48, the statutory precursor to *N.J.S.A.* 40:55D–68. *Ibid.*

On appeal in *Lacey,* we held that the trial court properly disregarded the municipality's ordinance prohibiting the rebuilding of a nonconforming structure if it had been at least seventy-five percent destroyed. *Id.* at 138, 290 *A.*2d 450 (citing *H. Behlen & Bros. v. Mayor & Council of Kearny,* 31 *N.J.Super.* 30, 37–39, 105 *A.*2d 894 (App.Div.1954) (invalidating a municipal ordinance allowing restoration of a "building destroyed to an extent less than seventy-five percent of its replacement value" because the ordinance subverted the legislature's intent in refusing to mandate a "rigid formula of that kind")). We declined to reach whether the Legislature, in using the term "partial" within *N.J.S.A.* 40:55–48, intended to encompass "all destruction [that is] less than total." Nevertheless, we agreed with the trial court that there was ample support in the record to conclude that "the use of the building as an inn was substantially totally destroyed ... and therefore its destruction exceeded partial destruction[.]" *Ibid.*

We similarly observed in *Kearny, supra,* 31 *N.J.Super.* at 39, 105 *A.*2d 894 that what comprises "partial destruction" depends upon "the facts of each case," and that a specific "percentage delineation by ordinance is not authorized." Consequently, we need not resolve the numerical disagreement here between plaintiff and the Board in this case as to the specific percentage of destruction to the structure caused by plaintiff and his contractors, nor whether that figure surpasses the fifty-percent level set forth in the Borough's amended ordinance. Instead, the court must examine the discrete facts presented and determine whether the municipal authorities erred in treating the level of destruction as "total" rather than "partial."

■ In considering the Board's application of the terms of the statute, we recognize that questions of statutory interpretation are reviewed de novo. *James R. Ientile, Inc. v. Zoning Bd. of Adjustment,* 271 *N.J.Super.* 326, 329, 638 *A.*2d 882 (App.Div.1994) (noting that "interpretation is a judicial function and the conclusions of the Board of Adjustment and the trial court are not, in consequence, entitled to any special deference") (citing *Cherney v. Matawan Borough Zoning Bd. of Adjustment,* 221 *N.J.Super.* 141, 144–45, 534 *A.*2d 41 (App.Div.1987)). We therefore accord no special deference to either the Board or the trial court on the legal question of whether plaintiff's destruction of the building was "total" or merely "partial."

■ The trial court noted that the Board had made no finding in this case as to whether the front building had been totally destroyed or merely partially destroyed. We agree with the court that the Board's resolution, as written, does not express a finding of total destruction in the most straightforward manner. The resolution does state, however, in pertinent part that:

4. The Zoning Permit does not allow destruction and reconstruction of the house.
5. The demolition and reconstruction effected by the applicant far exceeds the zoning approvals granted.

The clear implication of these resolution findings, imperfectly as they may be worded, is that the Board found that plaintiff had

dismantled the structure to a degree beyond mere "partial" destruction. That is the position that the Borough's zoning officer and its code enforcement officer have taken from the inception of the stop work order. We do not interpret the wording of the resolution to convey a more favorable assessment by the Board of what plaintiff had done. Having so construed the resolution, we must now consider whether that clearly-implied finding of total destruction is supported by the record as a matter of law. We conclude that it is.

The proofs before the Board reflect that, after plaintiff's plan was approved, extensive damage to the front building was discovered. It then became obvious that much more of the house would have to be removed than had been previously anticipated. By the time that the stop work order was issued, only the original foundation and footings remained, and new wall frames had been erected.

These circumstances closely resemble the facts in *Lacey, supra.* Both cases involve nonconforming structures that were destroyed, either by damage or by construction activity, to a considerable extent such that very little of the original structure remained. Here, by removing every part of the structure except the foundation and the footings, plaintiff effected a "total destruction" of the front building. *See* Cox & Koenig, *N.J. Zoning & Land Use Admin.* 11–4 (2012) (noting the "rule of thumb" that has developed in many municipalities, where if the foundation and at least two walls remain, the destruction is only partial).[7]

We recognize that plaintiff's architect Finelli opined that, contrary to the observations of Mackie, at least fifteen to twenty percent of the front building remained. Even if, for the sake of argument, we were to adopt Finelli's percentage estimate, such percentages are not controlling. *Kearny, supra,* 31 *N.J.Super.* at

---

[7] We do not adopt this rule of thumb as a legal standard, but simply note its description in the treatise as a common approach used in numerous municipalities.

39, 105 *A*.2d 894. Instead, we must consider whether the destruction is so substantial in nature—qualitatively if not quantitatively—to surpass the "partial" threshold that the statute expresses. Having done so, we agree with the Board's position that plaintiff's removal of all of the walls of the building down to the foundation and footings exceeds any reasonable notion of a mere partial demolition.

In addressing the question of severity, the trial court relied upon *Krul, supra,* 122 *N.J.Super.* at 18, 298 *A*.2d 308. In that case, the three-story main building of a complex of nonconforming buildings burned down. *Id.* at 21, 298 *A*.2d 308. The complex was used for the property owner's business in the sale and distribution of sheet metal and roofing materials. *Id.* at 20–22, 298 *A*.2d 308. Although the main building was totally destroyed, a series of one-story buildings occupying most of the remainder of the plot were not destroyed by the fire. *Id.* at 21–22, 298 *A*.2d 308. After the fire, the property owner sought a permit to build a one-story building in place of the old one for use in the same business. *Id.* at 22, 298 *A*.2d 308. The permit was denied, and litigation ensued. *Ibid.*

The Law Division judge in *Krul* took note that *N.J.S.A.* 40:55–48, the previously-noted precursor to *N.J.S.A.* 40:55D–68, did not contemplate the destruction of a single unit that is part of an overall nonconforming use. *Id.* at 25, 298 *A*.2d 308. The statute instead focused only on the destruction of a building which, by itself, constitutes the entire use. *See ibid.* The judge determined that "the nonconforming use statute should be interpreted to encompass the destruction of a part of *an integrated whole* of a business enterprise in the same manner as the destruction of a part of an individual structure." *Id.* at 27–28, 298 *A*.2d 308 (emphasis added). The judge therefore ruled that a permit to build the one-story structure in place of the destroyed structure should have been issued. *Id.* at 28–29, 298 *A*.2d 308. Our court affirmed that disposition, for the reasons expressed by the Law Division. 126 *N.J.Super.* at 152, 313 *A*.2d 220.

We disagree with the trial court that the present case is sufficiently analogous to *Krul* to justify reversal of the Board's determination. *Krul* involved the destruction of a building that was a part of a use comprised, as "an integrated whole," by an entire complex of buildings on the site. Here, the use of the front house is entirely independent of the use of the rear house. Each building is a stand-alone residence. We therefore regard *Krul* as factually distinguishable, and discern no inconsistency in reaching an opposite conclusion in the present case on these facts. The extent of destruction here was clearly not partial. Absent a variance, plaintiff had no right to restore the nonconforming structure.

In granting plaintiff relief in this matter, the trial judge was swayed by policy considerations that, in the judge's estimation, warranted a more lenient application of the statutory standards that govern nonconforming structures and uses. The judge determined that "it was not unreasonable for [plaintiff] to remove and replace the building's walls upon discovery of the unsafe and dilapidated condition of the existing walls." In reaching that conclusion, the judge expressed the view that a sounder policy approach is to permit the "renovation of debilitated non-conforming structures," as long as there is no unlawful expansion of the nonconformity. The judge reasoned that because plaintiff's replacement of the walls here did not expand the dimensions of the structure, the replacement should be judicially permitted without the need for variance relief.

We appreciate the trial judge's concern that the limitations on reconstruction that are set forth in *N.J.S.A.* 40:55D–68 may sometimes lead to harsh outcomes for owners of nonconforming structures who innocently come to learn that their buildings must be demolished. That policy concern, however, to the extent it has any validity, is best reserved for a potential legislative response, either through statutory amendments or through the adoption of municipal ordinances within the powers delegated to local govern-

ing bodies. *Cf. Avalon Home, supra,* 111 *N.J.* at 212–13, 543 *A.*2d 950.

For example, as the Supreme Court noted in *Avalon Home,* a municipality may revise its ordinances to designate certain previously-disallowed uses as permitted or conditional uses within a particular zone. *Id.* at 212, 543 *A.*2d 950. Another possibility, which plaintiff in this case unsuccessfully pursued in 2007 and 2008, is to demonstrate entitlement to a property-specific use variance, under the standards set forth in *N.J.S.A.* 40:55D–70(d). *Ibid.* Such remedial measures are appropriately authorized by local "elected and appointed officials," *see id.* at 213, 543 *A.*2d 950, or by the Legislature, rather than through policy choices made by the judiciary, *see Des Champs Labs., Inc. v. Martin,* 427 *N.J.Super.* 84, 108, 47 *A.*3d 25 (App.Div.2012). We offer *no* view on whether such enactments should be pursued.

In any event, the trial court's policy concerns about hardship to innocent property owners are misplaced in this case. Plaintiff allowed his roof and hot water system to leak until the loft floor caved in. Several of the neighbors who spoke at the Board's hearings observed that the property had not been well maintained. Although plaintiff conceivably might not have known that the leaks had caused such extensive damage to the walls, the record suggests that the damage to the structure could have been prevented or abated with proper care.

As the case law repeatedly observes, nonconforming uses and structures "subvert" sound planning. *Grundlehner, supra,* 29 *N.J.* at 274, 148 *A.*2d 806. It is therefore the prerogative of municipalities to ensure that such non-conformities eventually "wither and die." *McDowell, supra,* 334 *N.J.Super.* at 214, 757 *A.*2d 822. Accordingly, if an owner such as plaintiff allows his nonconforming building to degrade into a poor condition that requires a complete destruction of the building, the municipality should be permitted to terminate that use and require conformity.

## B.

■ Apart from these statutory underpinnings in *N.J.S.A.* 40:55D–68, the stop work order in this case was also justified by plaintiff's improper conduct in exceeding the limitations of the zoning permit that had been issued to him. Mackie's notations on the permit clearly show that the authorized work was limited in nature. The approval covered siding, shingles, and additional windows, but not "bumpouts." The permit did not state that plaintiff was authorized to remove all of the walls of the house down to its footing and foundation and then to rebuild the structure. Nor do the plans submitted by plaintiff conspicuously state that removal of all of the walls was contemplated. The plans do specify that the roof on the house was to be replaced, but that is hardly a disclosure that the walls beneath the roof also would be removed. Nor is the generic reference in the plans to the "Renovation Code" a sufficient indication that all four walls were expected to come down.[8] Moreover, the building inspector's determination that the structure was unsafe and needed to be dismantled was not an authorization to rebuild it.

Plaintiff had no legal right to exceed what the zoning officer's permit authorized. *See, e.g., Lang v. Zoning Bd. of Adjustment,* 160 *N.J.* 41, 733 *A.*2d 464 (1999) (affirming a zoning board's grant of a variance under *N.J.S.A.* 40:55D–70(c) which imposed a number of restrictions on the applicant's intended construction); *Burbridge v. Mine Hill,* 117 *N.J.* 376, 568 *A.*2d 527 (1990) (similarly affirming a conditional variance grant under *N.J.S.A.* 40:55D–70(d)); *see also N.J.S.A.* 40:55D–18 (noting a municipality's authority to issue zoning permits as a precondition to the "erection, construction, . . . conversion, removal or destruction of any building"). Having gone well beyond the permit's limitations, plaintiff

---

[8] In fact, the plans also state that *"all* codes, subcodes, building and health code requirements" were to be followed in carrying out the renovations. (Emphasis added). That reference would logically encompass the zoning ordinance, which plaintiff violated.

cannot fairly complain about the Board's actions enforcing those limitations.

## C.

Plaintiff next contends that the Board and the municipality should be equitably estopped from complaining about the destruction of the property, including the removal of the supporting walls. The thrust of his argument in this regard is that Mackie's issuance of a zoning permit entitled him to perform the extensive renovations that he ultimately undertook. We disagree.

It is well established that the doctrine of equitable estoppel is "'rarely invoked against a governmental entity.'" *Middletown Twp. Policemen's Benevolent Ass'n Local No. 124 v. Twp. of Middletown*, 162 *N.J.* 361, 367, 744 *A.*2d 649 (2000) (quoting *Wood v. Borough of Wildwood Crest*, 319 *N.J.Super.* 650, 656, 726 *A.*2d 310 (App.Div.1999)). Equitable estoppel may only be applied against a governmental entity "where the interests of justice, morality and common fairness clearly dictate that course." *Gruber v. Mayor of Raritan*, 39 *N.J.* 1, 13, 186 *A.*2d 489 (1962); *see also Twp. of Neptune v. N.J., Dep't of Envtl. Prot.*, 425 *N.J.Super.* 422, 438, 41 *A.*3d 792 (App.Div.2012) (rejecting an appellant's equitable estoppel claim against the State, even though the appellant was likewise a governmental entity).

In the specific context of the issuance of building permits, the application of estoppel requires proof of four elements: (1) the building permit was issued in good faith, (2) the building inspector acted "'within the ambit of [his] duty'" in issuing the permit, (3) a sufficient question of interpretation of the relevant statutes or zoning ordinances as to "render doubtful a charge that the ... official acted without any reasonable basis" for issuing the permit, and (4) there was "'proper good faith reliance'" on the issuance of the permit. *Jesse A. Howland & Sons, Inc. v. Borough of Freehold*, 143 *N.J.Super.* 484, 489, 363 *A.*2d 913 (App.Div.) (quoting *Hill v. Bd. of Adjustment*, 122 *N.J.Super.* 156, 162, 299 *A.*2d

737 (App.Div.1972)), *certif. denied,* 72 *N.J.* 466, 371 *A.*2d 70 (1976). Even assuming, for the sake of discussion, the first three of these elements are present here, the fourth element of plaintiff's "good faith reliance" has not been demonstrated.

Plaintiff attempts to liken his circumstances, and his claim of reliance, to the circumstances in *Hill, supra,* 122 *N.J.Super.* 156, 299 *A.*2d 737. In that case, a married couple applied for a permit to make certain additions to their home. *Id.* at 158, 299 *A.*2d 737. Their proposed additions would have reduced their sideyard setback to only four feet. *Ibid.* Although the local ordinance required a sideyard setback of seven feet, the building inspector nevertheless issued the permit in error. *Ibid.* Four months later, after "substantial" work on the project had been completed, the error was discovered and the permit was revoked. *Id.* at 159, 299 *A.*2d 737. By then, the foundation had been laid and inspected, the rough framing of the rooms and garage had been completed, the roof had been "rough-sheathed" and partially shingled, and the side of the garage and rear of the addition had also been rough-sheathed. *Ibid.* The homeowners had spent $3500 of an estimated cost of $6000. *Ibid.*

On appeal in *Hill,* we determined that the building inspector had acted erroneously but "within the province of [his] general duties," and so estoppel was not precluded for that reason. *Id.* at 162, 299 *A.*2d 737. Moreover, given the delay in the discovery of the inspector's error, and the intervening investments made by the homeowners in carrying out their plan, we ruled that the application of estoppel was appropriate and the homeowners should not be prevented from continuing their project. *Id.* at 163, 299 *A.*2d 737.

▮ The present case is fundamentally different than *Hill.* The homeowners in *Hill* reasonably relied upon the explicit approval of their plan, and actually followed it. Here, plaintiff received only a limited zoning approval of his plan, which allowed for "siding, shingles, [and] additional windows only[.]" Plaintiff then proceeded to remove every part of the building, except the foundation and

footings, and started to put up new walls. By doing so, plaintiff and his agents exceeded the scope of the zoning approval and created the very problem from which he now seeks to extract himself. The circumstances do not present a situation where a person has reasonably relied on a zoning official's express permission to do something. Such reliance being an essential aspect of estoppel, *see Boritz v. N.J. Mfrs. Ins. Co.,* 406 *N.J.Super.* 640, 647, 968 *A.*2d 1223 (App.Div.2009), the doctrine does not apply here.

Plaintiff acted at his peril, as he failed to consult with Mackie or other appropriate zoning officials before removing the flooring and walls within the house and beginning to erect new walls. If, hypothetically, he had been unsure about the extent of work authorized by the zoning permit, he was obligated to consult with such officials before going further.

## D.

For similar reasons, we reject plaintiff's related argument that the stop work order should be overturned based upon a notion of relative hardship. The concept of relative hardship is also an equitable doctrine, which can apply when mistakes are made by local officials in issuing permits despite violations of zoning ordinances. In such circumstances, the courts may consider the hardship of removing the nonconformity in determining whether to force the homeowner to do so. *See Hill, supra,* 122 *N.J.Super.* at 164, 299 *A.*2d 737; *Cohen v. Bd. of Adjustment,* 396 *N.J.Super.* 608, 621, 935 *A.*2d 842 (App.Div.2007).

Applying the doctrine of relative hardship in *Hill, supra,* 122 *N.J.Super.* at 164, 299 *A.*2d 737, we noted that the homeowners in that case would be forced to destroy the improvements that they had made before the litigation was brought. Apart from the funds the homeowners had already spent, it would have cost them additional outlays and would have rendered the garage too small for its intended use. *Ibid.* Moreover, the complaining neighbor in that case would "have suffered no discernible damage by the proposed construction[.]" *Ibid.* In fact, the Board of Adjustment

found that the sideyard violation was "consistent with many properties in the neighborhood." *Ibid.*

We revisited the concept of relative hardship in *Cohen, supra,* 396 *N.J.Super.* at 610–21, 935 *A.*2d 842. In that case, the homeowner hired two architectural firms to draw plans for a new home to replace his current home. *Id.* at 610–11, 935 *A.*2d 842. The plans were submitted to the borough, which then issued a building permit. *Id.* at 611, 935 *A.*2d 842. The plans "on their face appeared to conform to the zoning requirements," but did not with respect to building coverage and total lot coverage. *Ibid.* Neither architectural firm reviewed the local zoning ordinance before preparing the plans. *Ibid.* During construction, it was discovered that the house exceeded the building and lot coverage standards, and a stop work order was issued. *Ibid.* The zoning board also declined to issue a variance. *Id.* at 613–14, 935 *A.*2d 842.

We distinguished the facts in *Cohen* from those presented in *Hill, supra,* 122 *N.J.Super.* at 158–59, 299 *A.*2d 737. In *Hill,* "the errors in the plans ... were apparent on their face, and the municipal building inspector made a mistake in issuing the building permit." *Cohen, supra,* 396 *N.J.Super.* at 621, 935 *A.*2d 842. By contrast, the plan in *Cohen* "appeared to comply with the zoning regulations" and "the fault was primarily with [the homeowner] and his professionals, not with the municipal building inspector[.]" *Ibid.* For this reason, we determined in *Cohen* that the doctrine of relative hardship was not applicable under such circumstances. *Ibid.*

Plaintiff urges that principles of relative hardship should be applied in this case, so that the funds that he has already expended in this project are not wasted. We disagree. We recognize that Mackie acknowledged in his testimony before the Board that he had overlooked certain aspects of plaintiff's plan when it was initially submitted. However, that oversight did not fundamentally cause plaintiff's financial loss. The root cause of plaintiff's loss was plaintiff himself, in ignoring the limitations of Mackie's approval and in failing to consult with the proper local

officials when it appeared that all of the walls needed to be removed.

## III.

For these reasons, we affirm the trial court's rejection of plaintiff's equity-based arguments but reverse the court's nullification of the Borough's stop work order. The stop work order, and the Board's decision upholding that order, are therefore reinstated. The trial court shall issue a conforming order implementing our disposition within twenty days of this opinion.

Affirmed in part and reversed in part.