## NOT FOR PUBLICATION WITHOUT THE
## APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0729-22

ALBERT H. MANWARING, IV,
and MERLE MANWARING,

     Plaintiffs-Respondents,

v.

BOARD OF ADJUSTMENT OF
BOROUGH OF STONE HARBOR,

     Defendant-Respondent,

and

KEITH PENSABENE and
PAMELA PENSABENE,

     Defendants-Appellants.

_____

        Argued January 30, 2024 – Decided March 22, 2024

        Before Judges Mayer, Enright and Paganelli.

        On appeal from the Superior Court of New Jersey, Law
        Division, Cape May County, Docket No. L-0184-21.

Richard Michael King argued the cause for appellants (King Barnes, attorneys; Richard Michael King and Marisa J. Hermanovich, on the briefs).

Paul John Baldini argued the cause for respondent Board of Adjustment of Borough of Stone Harbor.

Robert A. Fineberg argued the cause for respondents Albert H. Manwaring, IV, and Merle Manwaring.

PER CURIAM

Defendants Keith and Pamela Pensabene appeal from a September 22, 2022 order reversing an approval granted by defendant Board of Adjustment of Borough of Stone Harbor (Board) and issuing variances under N.J.S.A. 40:55D-70(c)(2) (C-2 variance). Since we conclude the motion judge erred in his application of the law and the Board could have reasonably reached its decision, we vacate the order and remand for the court to reinstate the Board's approvals.

We glean the facts and procedural history from the motion record. The Pensabenes own property at 324 101st Street, Stone Harbor, New Jersey. The property is a nonconforming corner lot with a nonconforming single-family structure. Since it is a corner lot, the property has: (1) a front yard setback to 101st Street; (2) a front yard setback to Sunrise Drive; and (3) a side yard setback adjacent to property owned by Albert and Merle Manwarings' property.

2

In a December 29, 2020, Legal Notice sent to all property owners within 200 feet, the Pensabenes advised they made an "application to the [Board] in order to demolish the existing single-family dwelling and construct a new single-family dwelling that does not meet the minimum required lot area, lot depth, side yard setback or the maximum permitted building coverage."

The Legal Notice advised that the Pensabenes sought "[p]reliminary and final site plan approval, if required, pursuant to the Land Use Development Ordinance of Stone Harbor (Ordinance) as well as the Municipal Land Use Law (MLUL) pursuant to N.J.S.A. 40:55D-46 and N.J.S.A. 40:55D-70." Further, the Pensabenes sought

> Variance relief from the [Ordinance] and [MLUL] pursuant to N.J.S.A. 40:55D-70(c) for the following:
>
> . . . .
>
> c. Minimum required side yard setback, wherein [ten] feet is required, [four] feet[, nine] inches exists, and [four] feet[, nine] inches is being proposed.
>
> d. Maximum permitted building coverage, wherein 25% is permitted, 32.9% exists and 32.9% is proposed.[1]

---

[1] The Pensabenes also sought variance relief from the Ordinance and MLUL, for lot area and lot depth—pursuant to N.J.S.A. 40:55D-70(c)(1). The Board granted these variances and they are not part of this appeal.

A-0729-22

The Pensabenes presented testimony from two expert witnesses, an architect and an engineer. The architect's testimony involved "the proposed plan for the property." He explained there was no land for purchase or expansion around the Pensabenes' property. He highlighted the plan provided for: (1) two on-site parking spaces and one off-site parking space, noting currently the property had no on-site parking and, therefore, the plan would not impact on-street parking; (2) an increase from five feet, ten inches to ten feet, one inch on the front yard setback facing Sunrise Drive rendering the front yard setback conforming; (3) a slight improvement with regard to building coverage; and (4) compliance with height requirements.

The engineer testified as to the variances. He noted no variances would be needed regarding the front yard setbacks to 101st Street and Sunrise Drive. He explained that the front yards setbacks required a ten-foot-minimum. He further explained the plan envisioned the front yard setback on 101st Street would remain in compliance, going from the current nineteen feet, ten inches to a still-compliant ten feet, two inches, and the front yard setback on Sunrise Drive would become compliant at ten feet, one inch.

He also explained that variances would be needed for the side yard setback adjacent to the Manwarings' property and building coverage. He noted the side

A-0729-22

yard setback under the Ordinance required a ten-foot minimum. He explained the current side yard setback along the Manwarings' property was four feet, nine inches and the plan was to maintain that nonconforming four-foot-nine-inch setback. Further, he explained the maximum allowable building coverage was 25%; the building coverage with the current structure is 32.9%, and the proposed structure would maintain a building coverage of 32.9%. The side yard setback and building coverage required the C-2 variances sought by the Pensabenes.

The engineer acknowledged "anytime there's a request for relief from the zoning ordinance there is some departure" from the ordinance. Nonetheless, he explained: (1) both of the requested variances currently existed, therefore, the building coverage and side yard setback were an established part of the character of the neighborhood and preserving those characteristics could not be a detriment; (2) the plan created on-site parking where none presently existed; (3) the new side yard setback along Sunrise Drive would be conforming; (4) the "view corridors" for the intersection of 101st Street and Sunrise Drive would be significantly enhanced; (5) the new structure would be compliant with the design elevation requirements; and (6) the encroaching shower on the side yard facing the Manwaring's property would be eliminated.

5

Further, the engineer explained the plan would advance the purposes of the MLUL by: (1) complying with design flood elevation requirements and making the property secure from flood and other disasters; (2) promoting the appropriate population densities by continuing a single-family dwelling; (3) providing sufficient space and a variety of uses the new structure would be an upgrade from the existing structure, it would not change the character of or development pattern of the neighborhood, and its use as a single-family dwelling would be consistent with the zone plan; (4) promoting the free flow of traffic by providing off-street parking where none exists; and (5) promoting a desirable visual environment. The engineer concluded "[w]hen you look at the project in totality, . . . it w[ould] contribute to the preservation of the neighborhood and neighborhood aesthetics."

Following the experts' testimony, the Board opened the meeting for public comments and questions. Several neighbors spoke in favor of granting the application. Albert Manwaring objected to the plan. He was concerned with, among other issues, the side yard setback to his property and the front porch, proposed for the 101st Street side of the structure, with underneath parking. Regarding the side yard setback, he was concerned with "fire and safety." With

6

respect to the porch, he believed, contrary to the expert, "the parking garage effect" would not improve the aesthetics of the neighborhood.

Merle Manwaring agreed with Albert and testified against granting the application. She requested the Pensabenes "reconsider the offset from the street," as it would "be too close to [the Manwarings'] property [and inhibit the Manwarings'] ab[ility] to enjoy [thei]r property."

The Board closed the hearing, the Board Solicitor summarized the C-1 and C-2 variance standards, and the Board members engaged in discussion. The variances were discussed together and the Board voted to grant variance relief. The Board adopted a Resolution setting forth, in relevant part:

> WHEREAS, the Board after hearing the testimony and reviewing the application and evidence submitted made the following findings of fact and conclusions of law:
>
> . . . .
>
> 5. The Board finds the testimony of the [Pensabenes], [Pensabenes]' experts, and those of the public as well as the facts contained within the exhibits as credible.
>
> 6. The Board accepts as credible the testimony of [the Pensabenes' experts] regarding the exceptional undersized nature of the lot and the two lot frontages as a hardship upon the [Pensabenes] in developing a conforming structure on the parcel. The Board accepts the testimony of the experts that the unique shape of the parcel as a triangular shape with two front yards since

7

it is a corner lot also burdens the subject parcel. The Board accepts the testimony of the experts that the minimum side yard requirements based upon the size of the lot, frontage of the lot, and desirability of maintaining the existing foundational structure created a hardship in meeting the side yard requirement.

7. The Board accepts the testimony of the [Pensabenes' experts], and the public witnesses that several purposes of the [MLUL] are applicable to the [Pensabenes'] circumstance. The Board finds that the [Pensabenes'] plan will promote the public health, safety, morals, and general welfare. The Board finds that the [Pensabenes'] plan will secure safety from fire, flood, and other man-made disasters by conforming with the height requirements for FEMA and modernizing all codes within the structure. The Board finds that the proposed plan will provide adequate light, air, and open space. The Board finds that the proposed plan does establish appropriate population densities particularly since [the Pensabenes] are requesting to build a single-family structure where a duplex would be permitted. The Board finds that the proposed plan promotes a desirable visual environment through creative development techniques and good civic design and arrangement specifically relying upon the proposed plans of [the architect].

8. The Board finds that the benefits of the deviation from the Zoning Plan substantially outweigh any detriment to the Zone Plan in this particular case for the reasons stated by [the engineer] . . . .

9. The Board finds that the relief requested can be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of the Zoning Plan and Zoning Ordinance . . . based upon the testimony of [the architect] and [the

8

engineer] as well as the public witnesses to the effect that this proposed project will not change the character of the neighborhood, and is moving in the same direction as the neighborhood. The Board finds that the granting of the variance relief is consistent with the Master Plan and Zoning Ordinance . . . .

. . . .

WHEREAS, the [Board] has determined that the [Pensabenes] have met the burden imposed by N.J.S.A. 40:55D-70C2 and that several purposes of the [MLUL] will be advanced by the requested variances and the benefits of the deviation substantially outweigh any detriment from minimum lot area, lot frontage, and side yard encroachment . . . .

WHEREAS, the [Board] has determined that the relief requested can be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of the Zoning Plan and Zoning Ordinance since the proposed project will fit the character of the neighborhood and remain consistent with the intent and purpose of the Borough Zoning Ordinance and Master Plan[] . . . .

On May 21, 2021, the Manwarings filed a complaint in lieu of a prerogative writs. The Manwarings alleged the Board acted arbitrarily, capriciously, and unreasonably when it granted the Pensabenes' application and requested the trial court reverse the Board's approval of the variance relief. The Pensabenes and the Board filed their respective answers to the Manwarings'

A-0729-22

complaint, and the judge scheduled a hearing for the parties to present oral argument.

The judge held oral argument on December 16, 2021. After reciting the facts of the case, the judge shared his concerns, stating:

> [I] read the transcript and . . . paid particular attention to the transcript at the point where the Board was voting. Along with the Board comments. I disagree with some of the argument made by the parties that the Board had a discussion that was clear and full about th[e variances.] I will be perfectly honest with you, I had no idea what some of the Board members were saying. I could [no]t understand what the point was with some of the comments. So, I did not find any illumination from the comments made by the Board members as to what they were voting on. . . . I can[not] even tell from this record if all of the Board members knew which variances they were voting on at the same time.

The judge explained a "clearer record" was needed for him to analyze whether the Board's actions were arbitrary, capricious, or unreasonable. As a result, in pertinent part, the judge remanded the matter to the Board with instructions "to vote on the variances separately" and identify the specific section of N.J.S.A. 40:55D-70 implicated. On December 16, 2022, the judge entered a written order memorializing his oral decision and setting forth a supplemental briefing schedule.

On January 31, 2022, in accordance with the judge's order, the Board held the remand hearing. Following discussion, the Board voted to approve the side yard setback variance and building coverage variance under the C-2 criteria. After voting on the variance relief, the Board adopted a Supplemental Resolution granting the variances. The Supplemental Resolution set forth the following factual findings and conclusions of law:

> WHEREAS, the Board entered into additional findings of fact and clarification on motions:
>
> 1. The Board finds and adopts all of the evidence and testimony presented at the original hearing of March 1, 2021 and as specifically enumerated in [the Resolution] including all findings of fact.
>
> . . . .
>
> 4. The Board finds and readopts the findings of fact and evidence relevant to the side yard setback and building coverage variances and stands by those findings of fact as considered and found at the March 1, 2021 Hearing. At the March 1, 2021 Hearing, the Board found that the [Pensabenes]' plan will promote the public health, safety, morals, and general welfare. The Board found that the [Pensabenes]' plan would secure safety from fire, flood, and other man-made disasters by conforming with the height requirements for FEMA and modernizing all codes within the structure. The Board found the plan will provide adequate light, air, and open space. The Board found that the plan does establish appropriate population densities particularly since [the Pensabenes] are requesting to build a single-family structure where a

11

duplex would be permitted. Finally, the Board previously found the proposed plan promotes a desirable visual environment through creative development techniques and good civic design and arrangement based upon the architectural plans . . . . Those findings of fact are reaffirmed by the Board at the Remand Hearing.

5. The Board reaffirmed its finding that the benefits of the deviation from the Zoning Plan substantially outweighs any detriment to the Zoning Plan finding that the Board's review of the plan overall was a good fit for the neighborhood, and that the Board finds that the project was a good project with the full support of the Board.

6. Finally, the Board again considered the negative criteria and found again that the relief requested by the [Pensabenes] can be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of the Zoning Plan and Zoning Ordinance based upon the findings that the project plan was a good project plan and consistent with the neighborhood.

        . . . .

8. The Board finds that the Board intended to grant the side yard variance of [four feet, nine inches] for the plan, including the structure and front deck.

        . . . .

WHEREAS, the [Board] has determined that the [Pensabenes] have met the burden imposed by N.J.S.A. 40:55D-70C2 and that several purposes of the M[LUL] will be advanced by the requested variances for side yard setback, including the front deck, and building

12

coverage and the benefits of the deviation substantially outweigh any detriment for the granting of the aforesaid two variances and said variances for side yard setback for one side yard of [four feet, nine inches] including the front deck and building coverage can be granted so long as the [Pensabenes] comply with the terms and conditions set forth in [the Resolution]; and

WHEREAS, the [Board] has determined that the requested relief can be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of the Zoning Plan and Zoning Ordinance since the proposed project will fit the character of the neighborhood and remain consistent with the intent and purpose of the . . . Zoning Ordinance and Master Plan; and

WHEREAS, the [Board] specifically readopts all of the findings contained in [the Resolution] and incorporates all of those findings into this Resolution;

. . . .

NOW THEREFORE, LET IT BE RESOLVED by the . . . Board on this 7th day of February, 2022, that the application of [the Pensabenes] for variance relief for . . . side yard setback, including the front deck, and building coverage is hereby granted and approved subject to all of the terms and conditions contained in [the First Resolution] and for the reasons aforesaid and the reasons contained in [the Resolution].

Trial court held another hearing on May 10, 2022, and considered the parties' original submittals and the Manwarings' supplemental brief. The judge reserved his decision and, on September 30, 2022, entered an order and

13

accompanying statement of reasons reversing the Boards' approval of the Pensabenes' land use application.

The judge found the Board's approval was arbitrary, capricious, and unreasonable because: (1) the "Pensabenes did not apply nor advertise for a separate variance for the expansion of the pre-existing nonconforming structure, nor did the Board approve any such variance," relying in part on Engelside;[2] (2) in granting the side yard setback it failed to: (i) "point to even one" of the purposes of zoning being advanced; (ii) state any benefit to the side yard setback variance that substantially outweighed the detriment; (iii) did not analyze the impact of the side yard setback variance on the Manwarings' property; and (iv) only the Pensabenes' interests were advanced by the grant of the variance; and (3) the same reasons that supported his findings on the side yard setback variance supported his finding the building coverage variance was also improper.

---

[2] Engleside at West Condominium Ass'n. v. Land Use Bd. of Borough of Beech Haven, 301 N.J. Super. 628 (Law Div. 1997).

The Manwarings contend the judge's reversal of the Board's decision was correct.[3]  However, the Pensabenes contend on appeal the judge erred because: (1) he "substitute[ed his] own judgment for that of the Board where the Board's decision was supported by evidence, including expert testimony, public comments and discussion of the Board's opinion on two separate occasions"; (2) his "decision . . . rested on flawed analysis and application of New Jersey zoning law"; and (3) the Legal Notice was adequate.  The Board joins in the Pensabenes' arguments.

"Our standard of review for the grant or denial of a variance is the same as that applied by the Law Division."  Advance at Branchburg II, LLC v. Branchburg Twp. Bd. of Adjustment, 433 N.J. Super. 247, 252 (App. Div. 2013) (citation omitted).  "Ordinarily, when a party challenges a zoning board's decision through an action in lieu of prerogative writs, the zoning board's decision is entitled to deference."  Kane Props., LLC v. City of Hoboken, 214

---

[3]  The Manwarings also argue the Board's approval without a required variance from Stone Harbor Zoning Ordinance § 560-14 which, as amended after the Pensabenes filed their application, limited impervious lot coverage to fifty-five percent was arbitrary, capricious, and unreasonable.  However, the judge declined to consider that argument, finding the "time of application rule," N.J.S.A. 40:55D-10.5, precluded such consideration.  The Manwarings have not appealed that decision and, therefore, we do not consider that argument here. See Davis v. Devereux Found., 209 N.J. 269, 298 n.9 (2012).

N.J. 199, 229 (2013).  The board's "factual determinations are presumed to be valid and its decision to grant or deny relief is only overturned if it is arbitrary, capricious[,] or unreasonable."  Ibid. (citing Burbridge v. Twp. of Mine Hill, 117 N.J. 376, 385 (1990); Kramer v. Bd. of Adjustment of Sea Girt, 45 N.J. 268, 296 (1965)).  While the board's factual findings are entitled to substantial deference, its legal conclusions are subject to de novo review.  Nucel v. Little Ferry Planning Bd., 208 N.J. 95, 102 (2011).  "Because a board of adjustment's actions are presumed valid, the party 'attacking such action [has] the burden of proving otherwise.'"  Cell S. of N.J. v. Zoning Bd. of Adjustment, 172 N.J. 75, 81 (2002) (alteration in original) (quoting N.Y. SMSA Ltd. P'ship v. Bd. of Adjustment, 324 N.J. Super. 149, 163 (App. Div. 1999)).

The proper scope of judicial review is "to determine whether the board could reasonably have reached its decision."  Davis Enters. v. Karpf, 105 N.J. 476, 485 (1987) (citing Kramer, 45 N.J. at 285; Kessler v. Bowker, 174 N.J. Super. 478, 485 (App. Div. 1979)).  A reviewing court "will not substitute its judgment for that of a board 'even when it is doubtful about the wisdom of the action.'"  Cell S., 172 N.J. at 81 (quoting Cellular Tel. Co. v. Zoning Bd. of Adjustment, 90 F.Supp. 2d 57, 563 (D.N.J. 2000)).  "[C]ourts ordinarily should not disturb the discretionary decisions of local boards that are supported by

16

substantial evidence in the record and reflect a correct application of the relevant principals of land use law." Lang v. Zoning Bd. of Adjustment, 160 N.J. 41, 58-59 (1999). "Accordingly, we will not disturb a board's decision unless we find a clear abuse of discretion." Cell S., 172 N.J. at 82 (citation omitted).

"[T]he [board's] giving of statutory notice of hearing is a jurisdictional requirement, and unless notice is given as required by statute the board lacks power to hear or consider an application even if the subject matter is within its statutory power." Twp. of Stafford v. Stafford Twp. Zoning Bd. of Adjustment, 154 N.J. 62, 79 (1998) (alteration in original) (citations omitted). In accord with N.J.S.A. 40:55D-11, "[n]otices . . . shall state the date, time and place of the hearing, the nature of the matters to be considered." Plainly,

> the purpose for notifying the public of the "nature of the matters to be considered" is to ensure that members of the general public who may be affected by the nature and character of the proposed development are fairly apprised thereof so that they may make an informed determination as to whether they should participate in the hearing or, at least, look more closely at the plans and other documents on file.
>
> [Perlmart of Lacey, Inc. v. Lacey Twp. Planning Bd., 295 N.J. Super. 234, 237-38 (App. Div. 1996).]

When evaluating the evidence presented during hearings, "'the Board 'has the choice of accepting or rejecting the testimony of witnesses. Where

reasonably made, such choice is conclusive on appeal.'" Kramer, 45 N.J. at 288 (quoting Reinauer Realty Corp. v. Nucera, 59 N.J. Super. 189, 201 (App. Div. 1960)); accord Allen v. Hopewell Twp. Bd. of Adjustment, 227 N.J. Super. 574, 581 (App. Div. 1988) (stating the board had discretion to "accept or reject" the expert's opinions).

In considering a C-2 variance, the board must determine if "the purposes of th[e MLUL] . . . would be advanced by a deviation from the zoning ordinance requirements and the benefits of the deviation would substantially outweigh any detriment." N.J.S.A. 40:55D-70(c)(2). "'By definition, then, no [C-2] variance should be granted when merely the purposes of the owner will be advanced. The grant of approval must actually benefit the community in that it represents a better zoning alternative for the property.'" Lang, 160 N.J. at 57 (quoting Kaufmann v. Planning Bd. of Warren, 110 N.J. 551, 562 (1988)).

When analyzing a C-2 variance application, the Board must consider the request in light of the totality of the circumstances. "[A] variance cannot be considered in isolation, but must be considered in the context of its effect on the development proposal, the neighborhood, and the zoning plan." Pullen v. Twp. of S. Plainfield Planning Bd., 291 N.J. Super. 1, 9 (App. Div. 1996).

A-0729-22

The Board "shall include findings of fact and conclusions based thereon in each decision on any application for development and shall reduce the decision to writing." N.J.S.A. 40:55D-10(g). The Board "shall provide the findings and conclusions through [a] resolution adopted at a meeting." N.J.S.A. 40:55D-10(g)(1).

The Board's resolution "must contain sufficient findings, based on the proofs submitted, to satisfy a reviewing court that the board has analyzed the applicant's variance request in accordance with the statute and in light of the municipality's master plan and zoning ordinances." N.Y. SMSA, L.P. v. Bd. of Adjustment of Twp. of Weehawken, 370 N.J. Super. 319, 333 (App. Div. 2004). "The factual findings set forth in a resolution cannot consist of a mere recital of testimony or conclusory statements couched in statutory language." Id. at 332-33. In addition, "[i]t is the resolution, and not board members' deliberations, that provides the statutorily required findings of fact and conclusions." Id. at 334 (citation omitted).

Our inquiry is threefold: (1) what variances were necessitated by the Pensabenes' application; (2) did they provide sufficient notice of the required variances; and (3) could the Board have reasonably reached its decision in granting variance relief.

With the exception of the foundation, the Pensabenes' plan was to demolish the existing structure. The Legal Notice advised they were "seeking relief in order to demolish the existing single-family dwelling and construct a new single-family dwelling" and variance relief from the "[m]inimum required side yard setback, wherein [ten] feet in total is required, [four] feet[, nine] inches exists and [four] feet[, nine] inches is being proposed" and "[m]aximum permitted building coverage, wherein 25% is permitted, 32.9% exists and 32.9% is proposed."

There is no dispute the existing structure was a pre-existing nonconforming structure. Once demolished, however, the pre-existing nonconforming structure would cease to exist. See Motely v. Borough of Seaside Park Zoning Bd. of Adjustment, 430 N.J. Super. 132, 144 (App. Div. 2013) (quoting S & S Auto Sales, Inc. v. Zoning Bd of Adjustment of Borough of Stratford, 373 N.J. Super. 603, 619-20 (App. Div. 2004)) ("total destruction of such a structure, 'whether by the owner's design or by accident,' terminates the nonconforming use").[4]

The Pensabenes' plan to demolish the entire structure, except for the foundation, is a total destruction. "Prior cases have construed total destruction

_____

[4] For this analysis, there is no meaningful distinction between use or structure.

to mean substantially totally destroyed." Motley, 430 N.J. Super. at 144 (internal quotations omitted) (citations omitted). In Motley, we observed "by removing every part of the structure except the foundation and the footings, plaintiff effected a total destruction." Id. at 147.

Here, the judge acknowledged "the existing building [wa]s to be demolished except for the foundation" and that "this constitute[d] more than a partial destruction," but nonetheless found that it was "appropriate to analyze th[e] change as an expansion of a pre-existing nonconforming structure." However, there would be no pre-existing nonconforming structure after the structure was totally destroyed. Therefore, the Pensabenes' application should not have been viewed through the lens of an expansion of a pre-existing nonconforming structure. In this respect the judge's analysis and the Manwarings' arguments are misplaced.

Similarly, the judge's reliance on Engleside was misplaced. In Engleside, the issue was "whether the expansion of a nonconforming structure require[d] a subsection c or d variance pursuant to N.J.S.A. 40:55D-70." Id. at 630. Engleside is not relevant here since we are not concerned with the expansion of a nonconforming structure.

A-0729-22

The judge was correct in finding the Pensabenes "did not apply nor advertise for a separate variance for the expansion of the pre-existing nonconforming structure, nor did the Board approve any such variance." However, the Pensabenes were not required to advertise for such a separate variance because they were not seeking such an expansion. Instead, the Pensabenes were merely seeking C-2 variance relief.

Understanding the variance required for the Pensabenes' application, we next turn to the sufficiency of the Pensabenes' Legal Notice. As relevant here, the Pensabenes' Legal Notice advised it was planning to demolish the structure and requested: (1) minimum required side yard setback, wherein ten feet is required, four feet, nine inches exists and four feet, nine inches was proposed; and (2) maximum permitted building coverage, wherein 25% is permitted, 32.9% exists and 32.9% was proposed.

The Legal Notice complied with N.J.S.A. 40:55D-11 by stating "the nature of the matters to be considered." Further, the Legal Notice fairly apprised of "the nature and character of the proposed development so [the public] could make an informed determination as to whether they should participate in the hearing" or "look more closely at the plans and other documents on file." Perlmart, 195 N.J. Super. at 237-38. Thus, the Legal Notice was sufficient.

Having determined the Pensabenes appropriately sought C-2 variance relief, not an expansion of a nonconforming structure; and their Legal Notice provided sufficient information regarding the requested variances, we next address whether the Board's grant of the variances was arbitrary, capricious, or unreasonable.

Given our narrow scope of review, we are satisfied the criteria for the C-2 variances was adequately demonstrated in this case. The Board's resolutions clearly and unequivocally detailed its findings. The grant of approval must "actually benefit the community in that it represents a better zoning alternative for the property." Kaufmann, 110 N.J. at 563. In this respect, the Board's determination, supported by unrefuted and credible expert testimony, concluding the purposes of the MLUL, sub-sections (a), (b), (c), (e), and (i) of N.J.S.A. 40:55D-2 would be advanced by the plan and the benefits of variances substantially outweighed the detriments, is sufficiently supported in the record.

To the extent we have not addressed any of the Manwarings' remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Vacated and remanded for the court to reinstate the Board's approvals. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0729-22